INTERSTATE COMMERCE COMMISSION v. TEXAS & PAC. RY. CO.

(Circuit Court of Appeals, Second Circuit. October 17, 1893.)

1. CARRIERS—INTERSTATE COMMERCE LAW—DISCRIMINATION—OCEAN COMPETITION.

Under sections 2 and 3 of the interstate commerce law (24 Stat. 379, 380,) the mere fact of the existence of ocean competition (assuming that such competition may in some cases and in some degree warrant a difference in rates) will not justify a railroad company's rates for carrying merchandise from New Orleans to San Francisco which comes to New Orleans from domestic points, which rates are treble, and in some cases four times, the rates charged for carriage of like kinds of merchandise from New Orleans to San Francisco which reach New Orleans from foreign ports, although such lower rates constitute the only condition on which the carrier can obtain any part in such foreign traffic. 52 Fed. Rep. 187, affirmed.

2. SAME—CIRCUIT COURTS—ENFORCING INTERSTATE COMMERCE COMMISSIONERS' ORDER.

The circuit court should enforce an order of the interstate commerce commission forbidding any discrimination in rates, even though some

discrimination might be justifiable, when it appears that the rates actually charged are unlawful, and the carrier makes no showing as to what would be a lawful discrimination in view of the circumstances.

**3.** SAME—PARTIES—JOINT RATES.

An order of the interstate commerce commission, made against two railroad companies in respect to a joint rate, in a proceeding to which both were parties, may be enforced by a circuit court against one of the companies which is within its jurisdiction, although the other is without its jurisdiction, and cannot be made a party. 52 Fed. Rep. 187, affirmed.

**4.** FEDERAL COURTS—JURISDICTION—DOMICILE OF RAILROAD COMPANY.

In the absence of any charter provision on the subject, the principal office and domicile of a railroad corporation, for the purposes of suit in a federal court, is in the district where its stockholders' and directors' meetings are held, where the records thereof are kept, together with the stock certificate book, and where the principal officers have their offices, rather than in a different district, where the general administrative offices of the heads of departments are located.

Appeal from the Circuit Court of the United States for the Southern District of New York.

In Equity. Application by the interstate commerce commission to enforce an order made by it against the Texas & Pacific Railway Company forbidding discrimination in freight rates. The petition was granted by the circuit court, (52 Fed. Rep. 187,) and the respondent appeals. Affirmed.

Winslow S. Pierce and David D. Duncan, for appellant.

John D. Kernan and Edward Mitchell, U. S. Dist. Atty., for appellee.

Before LACOMBE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. On March 23, 1889, the interstate commerce commission made, not upon contention of parties, a general order, which, among other things, provided as follows:

"Imported traffic transported to any place in the United States from a port of entry, or place of reception, whether in this country or in an adjacent foreign country, is required to be taken on the inland tariff governing other freights."

This order was quite generally obeyed by those railroad companies and their connecting lines which carried imported goods westward from the northern Atlantic seaboard. At least six railroad companies ceased, after said order, their previous practice of discrimination in favor of imported traffic. On June 19, 1889, the commission filed its decision in regard to export rates in the case of New York Produce Exchange v. New York Cent. & H. R. R. Co., 3 Inter St. Commerce Com. R. 137. The opinion shows that the "trunk lines," so called, had, "under resolutions of their association, made through export rates, of which the inland proportion accepted by them was, at the port of New York, often ten cents or more per hundred pounds less on like traffic than the published tariff rates charged at the same time to the same port." It was held "that the discrepancy between the proportion of the through rate accepted and the established tariffs for seaboard consignments for

the same inland carriage is not shown to have been justified by any circumstances tending to show that it was just or proper, and that it must therefore be deemed an unjust and unlawful discrimination as against the transportation terminating at that port," and that "the only practicable mode yet devised for making through export rates, as appears by past experience, is to add to these established inland rates from the interior to the seaboard the current ocean rates." This decision was confined to export rates at the port of New York, but, as thus made, was of almost national importance. It is believed that the railroad companies which were parties to the litigation complied with the order of the commission.

In this state of the general railroad policy which had been established by the commission in regard to rates which discriminated in favor of either import or export traffic against inland traffic, the New York Board of Trade and Transportation filed before the interstate commerce commission, on November 29, 1889, a complaint against the Pennsylvania Railroad Company and its connecting western railroad companies, charging, in substance, that these corporations were, in violation of the act to regulate commerce, guilty of unjust discrimination, in that, for the transportation of property to Chicago and other western points, which was delivered to them at New York or Philadelphia by vessels or steamship lines from foreign ports, under through bills of lading, they were charging rates 50 per cent. lower than for the like and contemporaneous service rendered to property delivered at New York or Philadelphia which did not arrive from foreign ports. Subsequently, the San Francisco Chamber of Commerce became a party complainant, and divers other railroad companies, among them the Texas & Pacific and the Southern Pacific Railroad Companies, were made parties defendant, until 28 companies were defendants. This complaint was apparently brought to compel universal obedience to the order of March, 1889. The commission dismissed the complaint as to 18 defendants and found that its averments were true as to 10 defendants, among which were the Texas & Pacific and the Southern Pacific Companies, and as to said defendants ordered, on January 29, 1891, that each of them, on and after May 5, 1891, cease from carrying any article of import traffic shipped from any foreign port through any port of entry of the United States, or any port of entry in a foreign country adjacent to the United States, upon through bills of lading, and destined to any place within the United States, upon any other than the published inland tariff covering the transportation of other freight of like kind over their respective lines from such port of entry to such place of destination, which order was duly served upon the Texas & Pacific Railroad Company.

On or about January 18, 1892, the commission brought its petition against said company before the circuit court for the southern district of New York, alleging that it had willfully violated said order by charging, collecting, and receiving freight rates which had been declared to be illegal, and by way of specification the petition alleged that the offending and also the regular inland rates were shown in a table annexed to the petition, marked "Exhibit 36."

The findings of fact by the commission upon the original complaint were made part of the petition. The prayer of the petition was for an injunction against further disobedience of the order. The defendant's answer denied that its principal office was in the state of New York. It denied no other allegations of fact, but denied that the order was a lawful order. It stated that the rates which were complained of were, so far as they were made for inland carriage, the joint rates over its railway and the Southern Pacific Railway, and cover the carriage by the rails of the defendant from New Orleans to El Paso, Tex., and by the rails of the Southern Pacific road from El Paso to San Francisco. The answer admitted that it charges, demands, collects, and receives, and has since the date of 'the order charged, demanded, collected, and received, rates for the transportation of commodities from Liverpool and London via New Orleans and said two railways to San Francisco, and also from New Orleans via the same route to the same destination, substantially as stated in Exhibit 36. Its reason for a discrimination in inland rates between foreign and domestic merchandise will be stated hereafter. The answer further said that the order affected its rates from London, Liverpool, and other European points to Missouri river points, but that these rates became so low that it had canceled its tariff, and was charging on such business as it received, destined from Europe to the Missouri river, the local rates from New Orleans. The answer further stated that the order also affected its rates of transportation on articles from Europe to towns in Texas and Colorado. No testimony was taken before the circuit court. The case was heard upon petition and answer, and an injunction was directed against the defendant in accordance with the prayer of the petition. From this decree the defendant has appealed to this court.

Exhibit 36 shows a very marked discrimination in rates from New Orleans to San Francisco between those charged upon merchandise shipped by through bills of lading from Liverpool to San Francisco and those charged upon the same kind of goods delivered to the defendant at New Orleans from places in this country for transportation to San Francisco. For example, the through rates from Liverpool to San Francisco, per 100 pounds, on books, shoes, carpets, cashmeres, cutlery, and woolen goods were $1.07, of which the railroads received for carriage from New Orleans to San Francisco 80 cents; while upon the same classes of goods received from points in this country at New Orleans the rates for carriage from New Orleans to San Francisco, per 100 pounds, were as follows: Upon books and carpets, $2.88, upon shoes, cashmeres, cutlery, and woolen goods, $3.70. The finding of facts by the commission shows that in 1889 the importations of the Texas & Pacific Railway were about 5,000,000 pounds, of which about 2,500,000 pounds went to Missouri river points, about 2,000,000 pounds to the Pacific slope, California terminals, and Oregon points, and the remainder was distributed mostly in Colorado and Utah, while a little of it went to Texas. As the defendant is charged with a violation of the order only with respect to

its rates to California terminals, it is necessary to state no other facts than those which related to that part of its business. The through rates from Liverpool to San Francisco are controlled by the competition at Liverpool and London of steamships connecting with railroads across the Isthmus of Panama, and in a small degree, with respect to cheap heavy goods, of sailing vessels around Cape Horn. The defendant carries import traffic at the reduced rate to California terminals only. To intermediate points the regular inland rates are charged. This traffic is taken at the reduced rate, because, unless so taken, the defendant would, by reason of the competition, lose the business which it is expected will increase. The defendant places the dissimilarity of conditions between the transportation of imported and domestic goods solely upon this ocean competition. There is apparently no other reason why the inland rates should not be applied to all business, both domestic and foreign. No finding was made as to the profit upon the San Francisco business. There was a profit, when the case was heard before the commission, upon the Missouri river business. It was found that the Southern Pacific proportion of the through rate would not, in the absence of competition, be a full and fair return for the transportation service rendered. It gave the road something more than the actual cost of the movement of the freight.

The commission contended that upon these facts the defendant had violated the second section of the act to regulate commerce, which prohibits unjust discrimination in the compensation charged for like and contemporaneous services in the transportation of a like kind of traffic under substantially similar circumstances and conditions, and had also violated the third section, which prohibits any undue or unreasonable preference or advantage to any particular description of traffic. The defendant insisted that the dissimilar conditions growing out of the ocean competition freed its conduct from the prohibition of the statute. The commission was of opinion that this class of dissimilar conditions was not in the contemplation of the statute, and was not to be regarded in the regulation of inland tariffs of rates. Its language was as follows:

"These circumstances and conditions are indeed widely different in many respects from the circumstances and conditions surrounding the carriage of domestic interstate traffic between the states of the American Union by rail carriers; but, as the regulation provided for by the act to regulate commerce does not undertake to regulate or govern them, they cannot be held to constitute reasons in themselves why imported freight brought to a port of entry of the United States, or a port of entry of an adjacent foreign country destined to a place within the United States, should be carried at a lower rate than domestic traffic from such ports of entry respectively to the places of destination in the United States, over the same line, and in the same direction. To hold otherwise would be for the commission to create exceptions to the operation of the statute not found in the statute; and no other power but congress can create such exceptions in the exercise of legislative authority."

It further said:

"Imported foreign merchandise has all the benefit and advantage of rates thus made in the foreign ports. It also has all the benefit and advantage of the low rates made in the ocean carriage arising from the peculiar circumstances and conditions under which that is done; but when it reaches a port of entry of the United States, or a port of entry of a foreign country adjacent to the United States, in either event, upon a through bill of lading, destined to a place in the United States, then its carriage from such port of entry to its place of destination in the United States under the operation of the act to regulate commerce must be under the inland tariff from such port of entry to such place of destination covering other like kind of traffic in the elements of bulk, weight, value, and of carriage, and no unjust preference must be given to it in carriage or facilities of carriage of that freight. In such case all the circumstances and conditions that have surrounded its rates and carriage from the foreign port to the port of entry have had their full weight and operation, and in its carriage from a port of entry to the place of its destination in the United States, the mere fact that it is foreign merchandise, thus brought from a foreign port, is not a circumstance or condition under the operation of the act to regulate commerce which entitles it to lower rates, or any other preference, in facilities and carriage, over home merchandise or other traffic of a like kind carried by the inland carrier from the port of entry to the place of destination in the United States, for the same distance, and over the same line."

Its conclusion was that foreign and home merchandise, "under the operation of the statute, when handled and transferred by interstate carriers engaged in carriage in the United States, stand exactly upon the same basis of equality as to tolls, charges, and treatment for similar services rendered."

This rule, having been founded upon a construction of the statute, is a very broad one. It is applicable to all the foreign circumstances and conditions which affect rates, and the question whether it must be universally applied without regard to any circumstances which may exist in a foreign country, and whether dissimilarities which have a foreign origin are to be excluded from consideration under the operation of the statute, is an exceedingly important one, whose ultimate decision may have a wider influence upon the interstate commerce of the country than we can foresee. This legal question was not discussed in the export rate case, which was treated "as one of practical policy." We are not disposed to pass authoritatively upon this question, except in a case which demands it, and in which the effect of this construction of the statute is naturally the subject of discussion.

This petition presents a question of narrow limits, which relates only to the validity of the order so far forth as it concerns the conduct of the defendant in its joint rates for transportation of imported traffic from New Orleans to San Francisco, and is whether these rates subject domestic traffic between the same points to an undue disadvantage. The same conditions exist between New Orleans and San Francisco, with reference to each class of goods. There was no "difference in cost, expense, or the exceptional character of the service." The only reason which induces the defendant to take the import business is competition in Great Britain between water routes, which drives it to carry an imported case of cutlery for 80 cents per hundred pounds, when it requires a hundred pounds

of domestic cutlery to pay $3.70 for the same carriage. Assuming that ocean competition can create a dissimilar condition, which is to be considered in determining whether discriminations against particular classes of traffic are unjust, and is a fact to be taken into account in determining whether a particular traffic is subjected to an unreasonable disadvantage, (Phipps v. Railroad Co., [1892] 2 Q. B. 229,) does this condition justify the great disparity in rates in this case? While it is true that under·sections 2 and 4 of the statute substantially dissimilar conditions may justify dissimilarity in rates, it does not follow that any dissimilar condition, of whatever kind it may be, justifies any discrepancy in rates. Gross inequality shows either that the road which makes the inequality is unjust to itself in carrying goods without profit, "or else the larger rate gives an unwarranted return for the services rendered." Board of Trade of Chattanooga v. East Tennessee, V. & G. R. Co., Inter St. Commerce Decisions, Dec. 30, 1892. In this case it may fairly be presumed that the joint rates gave each road something more than the cost of movement, leaving repairs, interest upon floating debt, and all fixed charges to be paid by the rates upon some other traffic. The rates were not entirely unremunerative, and, if so, the much. larger rates placed upon domestic traffic not only compelled it to bear an undue burden, but gave the company an unwarranted. return. Exhibit 36 cannot be examined, in the light of the admit-ted facts of equality of conditions from the port of New Orleans, without the conviction that, unless the defendant is injuring itself by its rates upon imported goods, it is imposing an exceedingly high rate upon domestic goods. It is true that a person who pays only a fair price for a service cannot justly complain merely because another pays too little for the same service, (Garton v. Railroad Co., 1 Best & S. 112,) but this general truth does not meet the conditions of this case, which are of such inequality that the larger rates must be found to be excessive. It has been justly said by the commission that rates should not only be reasonable, but be relatively reasonable, and thus not become unjust in their results. Boards of Trade Union v. Chicago, M. & St. P. R. Co., 1 Inter St. Commerce Com. R. 215. It follows that the conduct of the defendant was in violation of sections 2 and 3 of the statute in question, and was properly attempted to be corrected by the order which was disobeyed.

But it will be urged that, if it is assumed that ocean competition can create a dissimilar condition, it follows that it is a condition which may rightfully be regarded in establishing rates for import and domestic traffic, and that the order of the commission which directed equality should not be enforced, because some inequality might be justifiable. The accusation against the railroad companies in the original complaint before the commission was not that they were charging too low rates upon import traffic, but that by these relatively excessive rates upon domestic traffic they were unjustly discriminating against the latter. The underlying question which arises upon the petition to the circuit court is the same. The defendant's answer before the commission averred that its "domestic rates are fair and reasonable in themselves." In its

answer to the petition it omits this averment, does not justify its rates upon domestic traffic, and does not state, if a reduction should be made, what excess of rates could properly be placed upon that kind of traffic; but defends the existing difference in rates solely upon the ground that if it charged higher rates upon the import traffic it would lose that class of business.

The final question before the circuit court was: "Is the order of the commission a proper one, and should obedience to it be insisted upon?" In order to decide that question, the answer presented two questions upon the subject of rates: (1) Can ocean competition be regarded, in any event, as creating a dissimilar condition? (2) If it can, is the difference in the existing rates justified by that condition? A third question might have been, but was not, presented, viz. in the event that the first question is answered in the affirmative, and the second is answered in the negative, does the dissimilar condition justify any, and, if so, what, dissimilarity in rates? To answer this question the court should have been informed in regard to the reasonableness of existing rates upon domestic traffic. This court is of opinion that, assuming that the first question can be answered in the affirmative, the second must be answered in the negative, and that an unfair inequality of rates is plainly manifest. There is nothing in the record which enables the court to determine that the assumed dissimilar condition justified any substantial dissimilarity in rates, and it ought not to permit disobedience to an order until it can suggest a better one as a substitute.

The defendant's apparent position that, inasmuch as substantially dissimilar conditions create dissimilarity in rates, the amount of dissimilarity in rates is not important,—cannot be sustained. That some dissimilar conditions justify dissimilarity in rates is true. That remote dissimilarities of condition justify any dissimilarities which the carrier chooses to make, is not true. To set aside the order of the commission, and permit the present excessive inequality of rates, in the absence of any attempt to show the reasonableness of the inequality, would not accord with justice.

Two objections which have been taken by the defendant to the jurisdiction of the court remain to be considered. Section 16 provides that in case of the disobedience of a common carrier, which is subject to the provisions of the act, to a lawful order of the commission, the latter can apply for an injunction by petition to the circuit court sitting in equity in the judicial district in which the carrier has its principal office, or in which the disobedience of such order has taken place. This petition was brought in the southern district of New York, upon the ground that the principal office of the defendant was in the city of New York, whereas it is said to be in Texas. The charter does not declare where the principal office of the company shall be. In fact, the stockholders' meetings and directors' meetings are held in New York, where also is the office of the president, first vice president, secretary, and treasurer of the company, and where the stock certificate books and records of the stockholders' and directors' meetings are kept. The New York office is thus

the domicile of the corporation, and the principal office, while the general or administrative offices of the heads of departments are in Texas.

It is also contended that, inasmuch as the rates upon import traffic were joint rates with the Southern Pacific Railway Company, and as any order of the circuit court requiring the defendant to desist from carrying business upon such joint rates would abrogate contracts and agreements to which said company is a party, it is a necessary party to the petition. It is true that in proceedings before the commission to test the legality of through rates, the commission, which has the power to make other common carriers parties, irrespective of their places of residence, has insisted upon the necessity of bringing in all the corporations which make the rates, and has said "They must be brought in—First, because they have a right to be heard; and, second, because an order made and purporting to control their action when they were not parties would be improper on its face, and in a legal sense ineffectual." Allen v. Railroad Co., 1 Inter. St. Commerce Com. R. 199. In the proceeding before the commission the Southern Pacific Railway Company was a party. The present proceeding is a petition to compel obedience to an order, made upon hearing, and presumably correctly made, which is brought before a circuit court whose jurisdiction over parties is limited and controlled by statute. The circuit court for the southern district of New York has no jurisdiction over the Southern Pacific Railway Company, whose principal office is not in that district. Neither would a circuit court in any one district in which the violation was committed, in Texas or Louisiana or California, probably be able to obtain jurisdiction over both the railroad companies which made the rates. The proceeding before the circuit court should not be rendered impossible in the event of its inability to obtain jurisdiction over all the disobeying companies which have united in making through rates, and inasmuch as the proceeding is to enforce an order already made, after hearing all the parties in interest, the presence of all the parties who have jointly disobeyed is not necessary or indispensable.

The decree of the circuit court is affirmed, with costs.