## DETROIT, G. H. & M. RY. CO. v. INTERSTATE COMMERCE COMMISSION.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1896.)

No. 252.

1. CARRIERS—INTERSTATE COMMERCE LAW—TRANSPORTATION AND ACCESSORIAL SERVICES.

In the provision contained in the first section of the interstate commerce law, that "all charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid or in connection therewith, or for receiving, delivering, storage, or handling of such property, shall be reasonable and just, and every unreasonable charge for such service is prohibited and declared to be unlawful," the word "charges" is used in the technical sense of segregated items of expense, or dues demanded in connection with the "transportation," or with the "receiving," etc., the accessorial service described by the latter terms (which include cartage) being thus distinguished from the transportation. And, although these terms are not repeated with the same particularity in sections 2, 3, and 4, this segregation of the two kinds of service is not to be overlooked, in their construction.

2. SAME—DISCRIMINATION BETWEEN LOCALITIES—GROUP RATES—ADMISSIONS.

The fact that a railroad company, in its schedule of freight rates, groups together two cities on its line, some distance apart, and charges the same rate for carriage to both, is not to be treated as a conclusive admission that the service is performed under substantially similar circumstances and conditions, within the meaning of the interstate commerce law, so

as to make it necessarily unlawful to furnish, without additional charge, an additional service at the further city, by cartage from its depot to the places of business of the consignees.

3. SAME—LONG AND SHORT HAULS—PRELIMINARY APPLICATION TO COMMISSION.

The provisions of the fourth section, forbidding a greater charge for a longer than for a shorter haul, under "substantially similar circumstances and conditions," and authorizing carriers to apply to the commission for leave to charge a less rate for the longer haul, do not make it unlawful, in itself, for the carrier to charge such less rate without first applying for and obtaining such permission. It may, on the contrary, establish such rate in the first instance, and when the same is challenged in the courts, or before the commission, may justify itself by showing a substantial dissimilarity of circumstances and conditions, within the meaning of the act.

4. SAME—AGGREGATE CHARGES—CARTAGE.

The prohibition of the fourth section is against a greater compensation for the shorter haul, "in the aggregate," which includes, not only the "rates" and "fares" (for transportation on the rails proper), but also the "charges" (for accessorial services including cartage). And therefore, where the "aggregate" is the same for both the shorter and the longer haul, the section is not violated, in its very terms, although in the case of the longer haul an additional cartage service is furnished, which is not furnished in the case of the shorter haul.

5. SAME—EQUALITY OF RATES—PRESUMPTIONS.

Where the carrier fixes an equality of compensation, in the aggregate, for two places some distance apart, on the same line, there must be an equality in fact as well as in form; but equality in form will be accepted as equality in fact, until it is shown to be colorable by him who challenges it.

6. SAME—DISSIMILARITY OF CONDITIONS AND CIRCUMSTANCES—CARTAGE.

Differences in population and tonnage traffic may constitute a "circumstance" or "condition" of dissimilarity, within the meaning of the statute; and it cannot be said that a railroad company may not reasonably, and without undue preference or advantage, or unlawful discrimination, collect and deliver, at its own expense, goods at one city, and not at another, when the difference in population is 70,000 to 6,000, and in traffic 1,000,000 tons to 55,000 tons.

7. SAME—LONG-ESTABLISHED CUSTOMS.

The long existence, before the enactment of the interstate commerce law, of a custom to collect and deliver freight by cartage, in a particular city, and not in others, may be one of the "circumstances" mentioned in the act as elements entering into the question of unjust and unfair discrimination.

8. SAME—LOCATION OF FREIGHT STATIONS—COMPETITION.

Other circumstances and conditions of great importance may be that, having long ago adopted such a plan of accessorial services by furnishing cartage, and adapted its terminal facilities thereto, the carrier's station is located a great distance from the traffic center of the city, and to now abandon such service, and extend its road and appliances to the traffic centers, would entail enormous expense for rights of way, and for construction and reconstruction; also, the fact that rival and competing carriers have their stations near the traffic centers, so that to abandon the cartage service would result in the annihilation of the company's business.

9. SAME—POWER OF "REGULATION"—PROPERTY RIGHTS.

The power to "regulate" the accessorial service facilities, which is given to the commission by the act, must, on a proper construction, be confined to the existing state of things in regard to the use of its property by each carrier. The power is one of "regulation," merely, and the commission and the courts have no authority to invade rights of property by entering the domain of deprivation, construction, and reconstruction of properties, to carry out the proposed regulation.

10. SAME—POWERS OF COMMISSION—ENFORCEMENT OF ORDERS BY COURTS.
    An order of the commission, directing a railroad company to wholly discontinue a long-established custom of furnishing cartage to consignees and consignors in a particular city, is not a "lawful order," such as the courts are required, by section 16 of the act, to enforce, if it will operate to deprive the carrier of its business at that place.

11. SAME—COMPETITION OF RIVAL LINES—QUESTION OF FACT—PRESUMPTIONS.
    The effect of the competition of rival lines in justifying rates is, in every case, a question of fact, which is not to be settled by any presumptions, either prima facie or conclusive. The question is to be tried in the courts, under the same rules as to presumptions, burden of proof, and the like, whether or not the carrier has applied to the commission, in the first instance, for permission to charge less for a longer than for a shorter haul.

12. SAME—LAWFUL DISCRIMINATION.
    For a carrier to protect himself against the physical disadvantage it is under in relation to its rivals is not an unlawful discrimination, if it be not used as a colorable device to evade the statute.

13. SAME—FORM OF COMMISSION'S ORDER—READJUSTMENT OF RATES.
    The method of redress by readjusting rates must always be left, in the first instance, at least, to the carrier itself; and an arbitrary and peremptory order to abandon a long-established accessorial cartage service at a particular place, without regard to any rates, or without any option to readjust them, is unlawful.

14. SAME—POWER OF COURTS—MODIFICATION OF ORDER.
    The power given to the courts to compel obedience to the "lawful order" of the commission, being special and statutory, is strictly limited to the power conferred; and consequently the courts can only grant or refuse compulsory obedience to the order, and have no authority to modify or change it. 57 Fed. 1005, reversed.

Appeal from the Circuit Court of the United States for the Southern Division of the Western District of Michigan.

This is a petition by the interstate commerce commission to compel the defendant railway company to obey its order in the matter of the application of Stone & Carten, asking that the company be required to desist from certain alleged violations of the interstate commerce act found by the commission to have been practiced by it. Being formally notified that the order would not be obeyed, the commissioners filed this petition. There was a disagreement between the two judges holding the circuit court, and a decree having been made in favor of the commission, in pursuance of the opinion of the presiding judge, as required by the statute, the defendant company appealed. It is not necessary to state here the details of fact appearing in the record of the proceedings before the interstate commerce commission, which are, reported in the case of Stone v. Railroad Co., 3 Inter St. Commerce Com. R. 613, nor in the record of the case in the circuit court, reported sub nom. Interstate Commerce Commission v. Detroit, G. H. & M. Ry. Co., 57 Fed. 1005; and we shall abridge them within the limits of this statement, sufficiently extended to explain our judgment.

The defendant company, although lying wholly within the state of Michigan, is, through its traffic connections, subject to the interstate commerce act. The city of Grand Rapids and the town of Ionia, respectively, are stations on this railway, 37 miles from each other; Ionia being that much nearer to the eastern terminus, from and to which the interstate traffic in that direction goes on over the defendant's railway to and from Ionia and Grand Rapids. These two stations being grouped together on the published schedules of the company, an equal rate is charged to shippers at either place. Grand Rapids is a city of 70,000, and Ionia of 6,000, inhabitants. In 1887 the aggregate carriage of goods from the one was 985,685, and for the other 55,000, tons. In 1858 the station house at Grand Rapids was first located where it now is,—an average distance of 1¼ miles from the business sections of the city. Two rival railway companies, competing with the defendant com-

pany for the interstate railway traffic to and from markets to the eastward, have located their station houses within an average distance of one-fourth of a mile from the business sections of the city. More than 25 years ago the defendant company established at Grand Rapids a system of collecting and delivering goods upon the premises of the consignors and consignees by a cartage service which it provides, and for which no other charge is made than that general sum appearing on the published schedules of rates as the equal freighting charge with that made to Ionia. It does not appear by the proof what may be the cost to the carrier of rail transportation proper to either place, nor whether the cartage is free, as being given without addition to that cost, or is added to it, and included in the general sum. The collecting and delivering are done by persons employed and paid by the defendant railway company for that service. No such collecting and delivering were ever or are now done at Ionia. The cost of carting at either place is estimated to be the same per hundredweight,—about two cents. It has long been customary in Michigan for railway companies to so collect and deliver goods in exceptional places, and in 1871, by an act of the legislature, quoted in the opinion, special authority in that behalf was granted to them. Competition between the merchants and dealers at Ionia and those at Grand Rapids is very slight,—practically amounting to nothing. The complainants before the interstate commerce commission are merchants at Ionia, and their objection is that the collecting and delivering service furnished by the defendant company at Grand Rapids is an unlawful discrimination, under the interstate commerce acts, and, upon an official investigation, the commission, holding it to be so, directed the following order to issue:

"At a general session of the Interstate Commerce Commission, held at its office, in Washington, on the 12th day of May, A. D. 1890.

"Present: Hon. Thomas M. Cooley, Chairman; Hon. William R. Morrison, Hon. Augustus Schoonmaker, Hon. Walter L. Bragg, Hon. Wheelock G. Veazey, Commissioners.

"Mary O. Stone and Thomas Carten v. The Detroit, Grand Haven & Milwaukee Railway Company.

"This case being at issue upon complaint and answer on file, and having been duly assigned for hearing on the 29th day of January, 1889, and a hearing having been had upon the pleadings, proofs, and arguments of counsel, and the report and opinion of the commission having been made and filed, whereby, among other things, it is found and decided that the defendant has put into effect a tariff schedule by which rates and charges for transportation of freights from Eastern points to Ionia and Grand Rapids, points on its line in the state of Michigan, are made the same,—Ionia being a shorter distance from said Eastern points than Grand Rapids,—and that the defendant, in connection with its transportation service, furnishes free cartage of freights at Grand Rapids to and from its station and its patrons' places of business, and does not furnish such free cartage at Ionia, and that by reason thereof said defendant does unlawfully give rebates from its published tariff or schedule of rates, fares, and charges at Grand Rapids to shippers and consignees at that point, and does, by the same means, unlawfully charge and receive a greater compensation, in the aggregate, for the transportation of like kinds of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line in the same direction, the shorter being included within the longer distance, in violation of the provisions of the act to regulate commerce: It is ordered and adjudged that the defendant, the Detroit, Grand Haven & Milwaukee Railway Company, be, and it is hereby, required, within thirty days from and after the service of a copy of the report and opinion in this proceeding, and of this order, to wholly cease and desist from furnishing free cartage of freights at Grand Rapids, in the state of Michigan, whereby rebates from its lawfully published schedule of rates, fares, and charges at its station or office in Grand Rapids are given to shippers and consignees, and charges for the transportation over its line of property shipped from Eastern points to Grand Rapids aforesaid are made less than charges for the transportation over its line of like kinds of property shipped from the same Eastern points to Ionia, in the

state of Michigan. And it is further ordered that a notice embodying this order be forthwith sent to the defendant corporation, together with a copy of the report and opinion of the commission herein, in conformity with the provisions of the fifteenth section of the act to regulate commerce."

The defendant company having declined to comply with this order of the commission, a petition was filed, praying for an enforcement of its order by injunction or other process, mandatory or otherwise. Upon final hearing the circuit court entered the decree from which the appeal is taken. It is materially different from the order of the commission heretofore set out, and, excluding the introductory recitals, is as follows:

"And it further appearing to the satisfaction of the court that the respondent, in affording free cartage at the city of Grand Rapids, in the state of Michigan, of interstate traffic between its stations and said city, while not affording the same at the city of Ionia, in said state, in respect of the same class of traffic [which was the subject-matter of the complaint of said Stone & Carten before the interstate commerce commission], violated the provisions of the act of congress entitled 'An act to regulate commerce,' by thus discriminating against said city of Ionia; and it appearing that said respondent is still continuing said act of discrimination: It is hereby ordered, adjudged, and decreed that the mandatory writ of injunction of this court do issue to said respondent, the Detroit, Grand Haven & Milwaukee Railway Company, commanding it and its officers and agents to forthwith desist and refrain from affording said free cartage at said city of Grand Rapids, unless a like service, or its equivalent in value, by reduced rates, be at the same time afforded at said city of Ionia, and unless the fact that such free cartage, or such equivalent reduced rate, is afforded at both points, shall be noted on the established tariffs of freights and charges published as required by law. The right of the petitioners is reserved to apply to this court for any further or other order in this cause based on the neglect or failure of said respondent promptly and fully to comply with the letter and spirit of this decree."

It was one of the contentions of the defendant railway company that this proceeding was in fact instigated and carried on by their rivals at Grand Rapids, and not really by the complaining merchants at Ionia. We do not deem it necessary, and it was not thought so either by the commission or the circuit court, to decide or notice that fact, since anybody may make such a complaint, or the commission may proceed upon its own motion, and neither any interest in the subject-matter, nor any injury to him who complains, is technically necessary to support a complaint. That fact becomes, therefore, quite immaterial. The assignments of error may be grouped into three: First, that there is, on the facts of the case, no violation of the act of congress; second, that, if there had been, the order of the interstate commerce commission is not the proper one to correct the abuse, and is an unlawful exercise of its authority in the premises; third, that the circuit court had no power to modify, change, or correct the unlawful order of the commission as was done by its decree.

E. W. Meddaugh (Otto Kirchner, of counsel), for appellant.

John Power, U. S. Atty., and R. L. Newnham, Asst. U. S. Atty. (D. E. Thomas, of counsel), for appellee.

Before LURTON, Circuit Judge, SAGE, District Judge, and HAMMOND, J.

HAMMOND, J. (after stating the facts as above). Before the development of railroads, carriers overland gathered the goods from the premises of the consignor, and delivered them at the door of the consignee, charging a single rate for the whole service. Carriers by water, ex necessitate rei, received the goods at the ship's side, or the wharfs adjacent thereto, and delivered them at like places; the consignors and consignees, respectively, bringing them to and taking

them from those places at their own expense. It was doubted at one time whether the cartmen engaged in the business of hauling the goods from place to place in the same town were common carriers, subject to responsibility as such, or only private carriers, but it has probably been since settled that they are subject to the larger liability. Brind v. Dale, 8 Car. & P. 207; Hutch. Carr. §§ 59, 61. By the common law, carriers overland were charged, among other things, with an obligation to deliver personally, while carriers by water were, for the reason stated, absolved from that obligation upon giving notice to the consignee of the arrival of the goods, and the place where they were deposited. It is not necessary to refer more specifically to the incidents of the collection and delivery by either class of carriers, since our only purpose is to call attention to the difference in that accessorial service to which cartage belongs. as it existed at the time when railroads first came into existence. Hutch. Carr. §§ 59, 69, 70, 82, 86, 94, 95, 295, 340, 357, 365, 366. It is manifest that the new business of carrying goods overland by rail would assimilate itself, from a like necessity rather to the mode in use by water carriers, than the other, in this matter of collecting and delivering the goods from and to the premises of the consignors and consignees. Hutch. Carr. § 367. It is, however, a somewhat curious result that notwithstanding this necessity of the railroads to carry only from station to station on their lines of rails, as ships from port to port on the water ways, the newborn railroad companies in England, from the beginning, through adherence to custom, probably, in part, but more through some peculiarities in conducting the business of carriage of goods in that country, to be presently noticed, forced the mode of collecting and delivering into a conformity rather with the method then in use by land carriers, while in America, as we judicially know, the almost universal practice of the railroad people is to receive and deliver as water carriers do. The accessorial cartage, therefore, has become, here, an almost wholly independent business, as it was and is in water carriage with which the railroads have nothing to do; but in England it was otherwise, and long before the modern traffic acts, like our interstate commerce act, and since, the courts of England were called upon frequently to deal with it in its connection with railroads, and their duty, either at common law, under their special acts of incorporation, or under these tariff acts, to treat all customers without unjust discrimination, in the carriage of goods and their compensation therefor. Our American books, so far as the investigations of counsel and our own have gone, seem almost entirely destitute of any cases upon the subject. The English cases require the most careful reading and close discrimination with reference to the separable nature of this accessorial service, to avoid a misleading confusion in their bearing upon this subject, and especially in their application to any occasional American practice of collecting and delivering to and from railroads by a cartage service. It is a mistake to suppose that either in England or America this cartage service for railroad transportation is a part and parcel of that transportation itself, strictly considered, as it certainly was in the pre-

viously existing carriage by land; but it is in both countries, as it always was in water carriage, a distinct, disconnected, and separate service from the rail carriage, and in its nature, as we have called it, purely accessorial. It is more certainly so with us than in England, but the confusion about it is easily accounted for when we come to investigate the legislation and the decisions in regard to it. At first, in England, if not here, the conception of a railroad was that it was, like the king's highway, open to all who wished to go upon it for the transportation of goods along its lines; and the earliest acts authorizing their construction, proceeding upon this theory, and the rules contained in the legislation for the regulation of the "tolls," "tonnage," "rates" and "charges," were based upon that conception of their use. The idea that the railroad owner should be himself a carrier of goods was at first almost wanting in the legislation concerning railroads. Very soon, in the process of evolution, he was authorized to become a carrier, others having the right, however, to share that business with him; the railroad owner most conveniently furnishing the motor power, whether of engines or other kinds, the trucks and carriages, just as he furnished the roadbed and lines of rails, and this whether he himself, or some other contractor, was the carrier of the goods. But the business of carriage was at first almost exclusively in the hands of other contractors than railroad owners, they occupying a relation to the lines of railway very much like that which in our day the express companies in this country bear to them, only the business of these "carriers" was much more extensive, embracing all goods, as well as small parcels for quick delivery. Paying the railroad company its "tonnage," "rates," "tolls," and "charges" for the use of the road, these outside carriers depended largely, if not wholly, for their profits, upon compensation for the accessorial service of collection and delivery, including particularly the cartage of the goods. Naturally they charged a lump sum to their customers, which covered the compensation for their own accessorial service, and the charges which they paid to the railroad company; there being no separation or distinction between the two, any more than in the old-fashioned land carriage, as far as the shipper was concerned, but in the settlement between the railroad company and the "carrier" the distinction appeared.

When the railroad companies, under the authority of subsequent legislation, assumed for themselves the functions of "carrier," as contradistinguished from those of owner of the road and its appliances, they directly came into competition with those outside carriers who used their lines, and in the matter of collecting and delivering, almost necessarily, had themselves to do the accessorial work, including cartage, and must also, necessarily, either furnish the facilities for doing it, or farm it out to others, sometimes doing one and sometimes the other; and, in the process of farming out this collecting and delivery, they oftentimes, if not always, engaged some carrier who was already equipped for the service in his own business, and he did the carting and other accessorial service for the goods of which the railroad companies became the carriers, as well

as his own. The compensation for this service, when the companies themselves were carriers, was sometimes charged separately to the consignors and consignees, and sometimes included in a lump sum, including the railroad rate as well. In their capacity as owners of the railroad and its appliances, they were compelled, both by the common law and by the special acts of legislation authorizing the construction and use of the road, and later by the English traffic acts, to submit to an equality of compensation and use of the road and its facilities with the other carriers, who had a right and did in fact use their road and its appliances, just as they were compelled by the common law and the same statutes to treat all shippers alike in their capacity as carriers, not owners. The human nature of the situation was that they should undertake, as much as possible, to favor their own business as carriers, and, as a matter of fact, they sought to draw to themselves the whole business of transportation, including this accessorial service and the profits that belonged to it. With like human nature, the outside carriers resented and resisted this practice of the railroad companies, and litigation was rife between them, which almost always involved this very subject of cartage and other accessorial service. One of the methods of the railroad companies in attracting custom to themselves as carriers was to offer what is termed "free cartage," and which was or was not free in fact, according to circumstances; and in order to determine whether it was free, or not, there was, of course, required a very exact, and almost mathematical, knowledge of the actual cost of carriage on the railroad proper. Particularly was this so where, in the billing to the customer, the aggregate sum for the whole service was charged, according to the ancient common-law practice, without separating the charges for the cartage. It is with this condition, habit, method, and practice that the English cases had to deal, and it is in that light they must be read, to avoid confusion. We know that, in the growth of our American system of railroad transportation, no such conditions have been developed. In this case the proof is that it is very exceptional for the railroads to do the carting required in collecting and delivering the goods, and it is said in argument that it obtains nowhere, except upon the Grand Trunk Railroad, and those connected with it or influenced by it; and this is perhaps accounted for by the fact that the Grand Trunk System has its origin and home in Canada, where, most likely, they would follow the English practice, rather than ours. So entirely separate, however, is this accessorial service from the general service of transportation upon the rails, that in England it was sometimes thought to require special authority of parliament to enable the railroad owners to engage in it. In re Baxendale, 5 C. B. (N. S.) 309, 327, where an act of parliament is quoted to that effect, authorizing "special facilities" to be acquired by contract, among other like accessorial services the collection and delivery of the goods being included; and, to secure equality in that service itself, a special tribunal, having none other than this service within its control, was empowered to act,—just as it was at first thought to require the same sanction to enable them to engage in the business of carrying

goods, in contradistinction to their ownership of the railroad. And we find in this very case that special legislation has been had in Michigan, where the case arose, authorizing railway companies to make personal delivery, by cartage service, under certain conditions and restrictions specified in the act. It is as follows:

"Sec. 3. Every railway company in this state is authorized to make personal delivery of every parcel, package or quality of goods or property, if the consignee of such property shall reside within two miles of the terminus, or railway station, or other terminus of the carriage of such property by the main line of such carrier, and they are hereby authorized to employ or own all the means necessary to perform such duty, and to place the men and vehicles therefor under the government and sole regulation of the superintendent or other principal officers of such companies. Such delivery shall be at the house, shop, office or other place of business of the consignee according to the nature of such property and where the owner or consignee desires to have the same." Comp. Laws 1871, § 2375.

In our American legislation, authorizing the railroad companies, not only to own the railroads, but also to enjoy substantially a monopoly of the carriage of goods upon them, whether special sanction is needed to authorize them to engage in the accessorial business of collecting and distributing the goods to and from the trains, we need not decide; but the existence of such legislation here and in England is quite conclusive of the separable and independent character of that service, in its relation to transportation over the rails. More than this, notwithstanding the confusion in practice, which, as we have pointed out, obtains in England, it has been time and time again decided in the cases which we shall presently cite, and all of which, more or less, involve the question of cartage, and other like accessorial service, that it is a separate and distinct business from that of transportation over the rails. The English judges have been confused, as we have been, by the mere terminology or nomenclature which has prevailed in practice; and in one case it is said that the phrase "terminal facilities" seems to have been appropriated, in railroad parlance, to other facilities than those which we have called "accessorial," although they are very much alike in their legal and practical nature, if not identical in their signification,—one judge, for the avowed purpose of distinguishing them, calling the latter "initial and terminating services." It seems to us quite immaterial whether you call that transfer service which in some places is termed "lighterage" or "ferriage," in other places "belt line service," in still others "spurtrack service," "terminal facilities," or by some other name, if its purpose be to collect and distribute the goods carried, when they are taken on or off the rails. It is, in the sense in which we have used the term, accessorial; and having the same objective purpose as the cartage, such as we have in this case, the considerations which enter into the determination of questions of unlawful discrimination should equally well apply to either. Mere physical connection—being more or less close—does not seem to us to make much difference, where there is no real distinction and separation in the nature and character of the business itself. Whatever the appliances used in collection and delivery, it is at last merely an accessorial service. And, however it may be

as to other such appliances, the cartage used in collecting and delivering at the initial and the terminating points is called indiscriminately by the judges "a separate business," one "beyond their line," one "not incident to them in their character of a railway company," and one "that is ancillary in its nature," one judge calling the cartmen "collecting carriers." Another speaks of it as "dehors the carriage," and "subsidiary thereto," and of the carriage and cartage as "totally distinct transactions," and to have "mixed up the two charges," in dealing with customers, is said to have been unlawful. Cockburn, C. J., in one of the cases, uses this language:

"We think this argument rests upon two obvious fallacies: First, that of supposing that the whole charge in question is made by the company in reference to their character and interest with respect to the railway, whereas in reality the charge is made by them in a character and interest independent of the railway, namely, as carriers to and from the termini of the railway; second, that the company can convert that which is in reality a charge for collecting and delivering, as well as for carrying, into one for carrying only, by affixing to it the latter denomination, in their table of rates."

Everywhere this practice is condemned, because the services are distinct, and should be separately scheduled, and so treated in the bookkeeping of the company. The commission and the court below ignored this separation, by treating the carriage on the rails and the cartage as a continuous carriage.

These English cases abundantly establish three propositions in relation to this subject: (1) That the collecting and delivery of goods is a separate and distinct business, notwithstanding the confusion to which we have adverted; (2) that the railroad companies, undertaking to do for themselves this separate business, cannot, by consolidating the compensation for each, avoid the restrictions that have been imposed upon them in respect of unlawful discriminations, and it is amply within the power of the railway commissions and the courts, according to the facts of each particular case, to separate the two, in order to prevent such an unlawful combination; (3) that, notwithstanding the separable and independent character of the two services, both, whether in the hands of the same or separate carriers, are subject to the rules and regulations prescribed by law to prevent unlawful discriminations. Pickford v. Railway Co. (1842) 10 Mees. & W. 399; Parker v. Railway Co. (1844) 7 Man. & G. 253; Id. (1856) 6 El. & Bl. 77; Baxendale v. Railway Co. (1857) 3 C. B. (N. S.) 324; Id. (1858) 5 C. B. (N. S.) 309, 336; Garton v. Railway Co. (1859) Id. 669; Id. (1859) 6 C. B. (N. S.) 639; Id. (1861) 1 Best & S. 112; Pegler v. Canal Co. (1861) 6 Hurl. & N. 644; Baxendale v. Railway Co. (1862) 11 C. B. (N. S.) 787; Id. (1863) 14 C. B. (N. S.) 1; Id. (1864) 16 C. B. (N. S.) 137; Palmer v. Railway Co. (1866) L. R. 1 C. P. 588; West v. Railway Co. (1870) L. R. 5 C. P. 622; Palmer v. Railway Co. (1871) L. R. 6 C. P. 194; Parkinson v. Railway Co., Id. 554; Evershed v. Railway Co. (1877) 2 Q. B. Div. 254; Id., 3 Q. B. Div. 134; Id. (1878) 3 App. Cas. 1029; Manchester, S. & L. Ry. Co. v. Denaby Main Colliery Co. (1884) 13 Q. B. Div. 674, 14 Q. B. Div. 209; Id. (1885) 11 App. Cas. 97; Liverpool Corn-Trade Ass'n v. London & N. W. Ry. Co. [1891] 1 Q. B. Div. 120.

Some of these later cases do not, perhaps, relate so much to cart-

age service as to analogous service by spur tracks and sidings, but the other cases involving cartage being much discussed in them, and treated on the same basis, they are cited to show how the earlier cases have been explained by the English courts themselves.    Not one of these cases, nor any that our researches have disclosed, treats the subject of cartage, free or compensative, in any relation to different localities, nor in such form as we have it presented in this case; but they treat it with great fullness in its relation to those who do the work of carriage on the railroads in competition with the railway companies themselves, and that of collecting and delivering at the termini, also in competition with the railroad companies and their agents or favorites, and they display a condition of freighting practice, and of the law relating to it, undoubtedly well known to those who framed our interstate commerce act, which, we know, was largely modeled upon the similar legislation existing in England, under which these causes were decided. We have the authority of the supreme court of the United States, in Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 264, 12 Sup. Ct. 844, that congress must have had this state of the law in mind, and that we may look to that fact while interpreting our own act. It should be observed, too, that congress well knew that in America the railroad companies, with the rarest exceptions, such as that we are dealing with in Michigan, have nothing to do, as a matter of practice, with the collection and delivery of goods to and from the stations, by engaging themselves in the business of carting.    We cannot think that, under the circumstances, it was the intention of congress to confuse, in our legislation, the carting to and from the stations with the transportation on the rails; and, if the act can be interpreted to avoid that confusion, it should be done.    We may suppose, since with us it is a business done almost exclusively by outsiders, and rarely by the railroad companies,—and, being usually done wholly within the territorial limits of a state, is not within the jurisdiction of congress,—that it was not intended to interfere with it, except so far as it might affect directly the transportation of goods between the states, by being used as a device to evade the jurisdiction over that subject.    We have no doubt that, whenever it does become an element of interstate commerce, it is within the control of congress, and falls within the regulations of this act; but, in determining how far its provisions apply to cartage, we should carefully keep in mind the fact that it is a separate and independent business, not usually carried on by the railroad companies themselves, nor usually within the scope of the act, or the power of congress.    In the case we have in hand, the proof shows that as a matter of fact the carting of which complaint is made is done by another under contract with the railroad company, and not by the railroad company itself.    If congress intended to enact that the railroad companies engaged in interstate commerce should not adopt at those points, respectively, any facilities, including cartage, which were useful and efficient in the necessary work of collecting the goods at the initial point of carriage, and delivering them at the terminus, without affording at each and every station the same

facilities, or their equivalent in money, by a reduction of rates, it would, no doubt, have said so in plain terms, and not left it to such implications as have been made upon this statute, requiring the nicest mathematical calculations to determine whether the right to that equivalency exists. It is only by knitting together the accessorial service and the carriage on the rails itself into one continuous carriage, such as was familiar to the ancient common law, but has been, as we have shown, generally abandoned as, to railroad transportation, that the carting service can be brought within the regulations of the act pertaining to equality of rates of compensation for the carriage. We do not conceive that congress had in mind to treat the accessorial service at each and every station,—we mean that outside the rails and their appurtenances and appliances,—and the carriage service on the rails, as one continuous service, as it has treated the service by connecting lines, in order to equalize the charges to all localities alike. If the two be kept separated, as we have shown the pre-existing law required they should, it then becomes a question of the regulation of equal facilities, rather than of equal schedule rates of freight charges. In considering that statutory equality which it was evidently the purpose of the law to enforce in reference, not only to schedule rates of freight charges, but to all other kinds of charges and to all "facilities" as well, the "circumstances and conditions," to use the language of the act itself, which naturally appear as elements in the problem of securing equality, would have a different bearing when we are dealing with individual shippers, or classes of shippers, to and from a station of the railway, from that which it would have when we are dealing with different localities more or less widely separated from each other along the line of the railway. The question of collecting and delivering is not the same when we are looking to that equality which the law demands between all the customers of this company shipping, for example, at Grand Rapids or Ionia, respectively, and between these two localities themselves, or between those two and the other stations on the line; and, in reading this act for construction, we must not ignore that difference, nor, in reading the cases pertaining to the subject, must we overlook that difference; for it is all-important in helping us to understand them, and in reaching a satisfactory result as to the proper interpretation of the act itself.

Looking, then, at the framework of the interstate commerce act, we see that it is the first section, rather than the others, which more directly deals with this subject. We do not for one moment doubt but that what we have termed "accessorial service" may be so manipulated as to violate any of the other sections, but what we suggest is that it is more specifically provided for by the first section. The separation of the attendant service from that of the main transportation on the rails appears in the proviso of the very first paragraph of the act, showing conclusively that congress was not inattentive to the disconnection between the two. There it is enacted "that the provisions of this act shall not apply to the transportation of passengers or property, or to receiving, delivering, storage or handling of property wholly within one state and not shipped

to or from a foreign country from or to any state or territory as aforesaid." And in the last paragraph of the section this distinction appears by the very language used, when it is enacted that "all charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for receiving, delivering, storage, or handling of such property, shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful." This language, interpreted by the light of the cases which we have cited, and the practices to which we have called attention, unquestionably uses the word "charges" in the technical sense of segregated items of expense or dues, which are to be demanded by the carrier for any service in connection with the transportation, or with the receiving, delivering, storage, or handling, of the goods; and each of these is required to be reasonable and just, and every unjust and unreasonable "charge" is prohibited. The words, "receiving," "delivering," "storage," and "handling," which describe that service which we have mentioned as "accessorial," including cartage, are not repeated in section 2, nor section 3, nor section 4, with the same particularity of expression, but it is an obvious rule of construction that in reading those sections the segregation of the first section should not be overlooked. It would perhaps not be an unreasonable construction of section 6 of the act to require that the railroad companies, in the printed schedules which they are to keep open to public inspection, should separately itemize any charges that they might make for carting in collecting or delivering the goods; and if, in this case, the complainants against the railroad company had asked to compel it to separate its compensation for transportation, as defined in the first section of the act, from its "charges" for cartage, it might have been directed to do so, though we need not decide that point. That section particularly required that they shall separate the "terminal charges," whatever that may mean, and any rules or regulations which may in any wise change, affect, or determine any part or the aggregate of such aforesaid "rates," "fares," and "charges"; showing again, plainly, that congress had this distinction in mind, for these very words are technical in their meaning.

The trouble in this case comes largely from the fact that the railroad company, ignoring the obvious and legal separation of the two services, has combined them into one; and neither in the findings of fact, as they appear in the record, either of the circuit court, or before the commission, nor in the proof, does that definitely appear which the cases we have cited show should always appear in determining a question like this, namely, what is the cost to the company of the actual carriage from station to station? So that we are left without any knowledge of the important fact whether or not this cartage is a source of profit to the company, or whether it is compensative, in the sense that the cost of it is actually paid by the shipper, or free, in the sense that it is gratuitous. Until we know that fact, we cannot tell whether there has been any unlawful discrimination, or not, considering it solely as a matter of discrimina-

tion in the rates of freight, as it was considered by the commission and in the court below. It appears in the proof that the value of the cartage is two cents per hundredweight, but it does not appear that, deducting that sum from the aggregate rate charged at Grand Rapids for both services, we thus arrive at the cost of the carriage on the rails proper; and therefore we cannot know whether, by the simple mathematical process of deducting the cost of cartage, it is free or gratuitous, though it does mathematically thereby appear, inexorably, that the rate to Ionia would then be greater, just as it would inexorably appear if the sum to be deducted were fixed with reference to some other accessorial service at Grand Rapids than the cartage, and it would come to this, that every service at the two places should always be kept precisely equal, in order to prevent this process of convicting the company of a mathematical inequality. But for the grouping that has been done, Grand Rapids could have been charged a larger rate than Ionia (the one, say, 52, and the other 50), and then, by deducting the cartage, no discrimination would mathematically appear, yet our question would be the same,—whether or not the act requires that collection and delivery shall be alike at both places? We cannot think that congress intended to impose any such burden as this upon the railroad companies. The assumption that it does rests entirely upon the theory that statutory equality is to be ultimately resolved by a bare inspection of the freighting rates as found in the schedule, which here, it is assumed, contained only the rail rate, if we may so contradistinguish it; for this is the same thing as when you say that the making of an equal rate on the schedule is conclusive of the right to equal service in all respects. If the rail rate at Ionia and Grand Rapids were as above illustrated, still, even though that were the fair and reasonable charge for it, there would be discrimination, mathematically considered, after deducting the cartage at Grand Rapids, because it is the longer haul for which more should be charged on the rails, or even under the other sections, if the charge there were less than it should be, considering the relative cost. It happens, almost factitiously, we might say, that, in the schedule of rates, Grand Rapids and Ionia are exactly equal. And unless there is to be a balancing of cost to the carrier as the test, as above suggested, the terms of the statute are not contravened by the equal rate. If more were charged to Grand Rapids, to cover cartage, Ionia could not complain; and, if the extra charge be thrown off, Ionia could not object, so long as, mathematically, there is not more charged for the shorter haul. We say "factitiously," because nothing in the proof shows any reason for this equality, unless it is to be inferred, as we think it possibly may be, that Ionia has been given the benefit of a competitive rate at Grand Rapids,—a rate less than otherwise it would be, if the company might find, under the statute, authority to make a discrimination in favor of Grand Rapids; and this possibly artificial and gratuitous advantage to Ionia it is now sought to further increase by insisting that, because the rate is equal, every service in and about the transportation should be kept likewise equal. If this be a proper construction of the statute, then we should say it

can only be justly administered by a preliminary inquiry which shall establish in the findings something more than the naked fact of an equal schedule rate, and we should have information of the precise cost to the carrier of that service which pertains to the movement of the goods upon the rails, and that which is so inseparably attached to it that it must be paid for in combination with it as a single sum; and then we should have information as to each and every separable service like cartage, noting any inequality of quantity, time, place, and circumstance that may properly enter into the economic problem of determining the exact amount of the sum to be deducted, if any, for the purpose of equalization.    That has not been done in this case.

By the fourth section of the interstate commerce act (Supp. Rev. St. 529), it is prohibited to common carriers to charge or receive any greater compensation for a shorter than a longer haul, as therein defined, under substantially similar circumstances and conditions; but, in the administration of the act it has been declared to be not always a violation of this prohibition to group the stations of the shorter and the longer haul at an equal rate.    Imperial Coal Co. v. Pittsburg, etc., R. Co., 2 Inter. St. Commerce Com. R. 618.    Grand Rapids and Ionia have been thus grouped, and the decision in the court below and before the commission treated this grouping as a conclusive admission by the railroad company that the transportation from station to station is under substantially similar circumstances and conditions; and because of that admission it necessarily follows that if the rate at Grand Rapids includes a charge for cartage which is not furnished at Ionia as well, the cost of that service being deducted, this section is violated.    The grouping which is allowed does not, we conceive, result in such a formidable estoppel as that suggested.    It is a question of fact— always a question of fact—whether the circumstances and conditions are substantially similar or dissimilar, and in one of the cases cited it is even said that this is so much the controlling rule of judgment that argument from authority of precedents seems to be without conclusive force in the exercise of this jurisdiction.    Palmer v. Railway Co., 1 C. P. 588.    And in another case it is said that:

"The conclusion is one of fact, to be arrived at looking at the matter broadly, and applying common sense to the facts that are proved. I quite agree with Wills, J., that it is impossible to exercise a jurisdiction such as is conferred by this section by any process of mere mathematical or arithmetical calculation. When you have a variety of circumstances, differing in the two cases, you cannot say that such a difference of the circumstances is equivalent to such a fraction of a penny difference of the charge in the one case, as compared with the other. A much broader view must be taken, and it would be hopeless to seek to decide a case by the attempted calculation. I should say that the decision must be arrived at broadly and fairly, looking at all the circumstances of the case,—that is, looking at all the circumstances which are proper to be looked at,—because, of course, the very question in this case is whether particular circumstances ought or ought not to be considered; but, taking into view all the circumstances which may be legitimately taken into consideration, then it becomes a mere question of fact." Phipps v. Railway Co. [1892] 2 Q. B. 229, 238.

It is true that this was said of the cases arising under the English acts which have no specific prohibition about the longer and shorter haul, such as is contained in the fourth section of our act; but it was said in discussing sections like our third section, against undue preferences and advantages, which were made to serve substantially the same purpose as our fourth section, and the "equality clause" of the English acts has always been held to be as inexorable in its prohibitive force, and therefore as inelastic in statutory construction, as our fourth section has been held to be. · If this grouping may be allowed, notwithstanding the prohibitions of the fourth section, as to places where the circumstances and conditions are wholly dissimilar, and upon entirely distinct grounds from any pertaining to essential similarity of all conditions, it cannot be that the grouping for an equality of rate is a conclusive admission by the company of a substantial similarity of circumstances and conditions. In the case above cited from the proceedings of the interstate commerce commission, the grouping was not wholly one of stations on the same line, but of many stations on several lines and throughout a wide extent of transportation territory, and it was not allowed because the circumstances and conditions were substantially similar, but because, however dissimilar, the uniform rate was not prejudicial, but otherwise, and it is impossible, on the facts of that case, that the circumstances should have been similar. Moreover, the commission in that case especially approves, in the administration of our act, the legislative declarations of the then recent English act of 1888 on this subject, where the grouping is permitted when the distance shall not be unreasonable, and the group rates charged, and the places grouped together, shall not be such as to create an undue preference; and furthermore, in its own reasoning about grouping, the commission says:

"It may, however, be lawful, and be supported by just considerations, for carriers to give equal access to markets to localities of dissimilar distances, and it may involve no material difference in the expense of the carrier. * * * In other cases it may be unreasonable, and therefore unlawful, to give equal rates to adversely situated localities, where the demand does not exist for a larger supply, and where conditions intervene that give an undue preference and advantage to the less favorably situated localities."

This is sufficient to show that the grouping and consequential equality of rate, if it implies anything as to the circumstances and conditions, only admits that, however dissimilar these may be, the equal rate is not prejudicial, certainly not to the public, possibly not to the carrier itself; but this is altogether a different thing from saying that it is an admission that the circumstances and conditions affecting the transportation, and affecting the cost of it to the carrier and the benefit of it to the public, are substantially similar. And it is this inflexible assumption of that fact which has been, by the decision of the court below and of the commission, imposed upon the respondent company, solely by reason of the grouping, thereby precluding any inquiry, under the fourth section, into any conditions or circumstances that might justify an inequality of rate under that section; for be it remembered that, although this section authorizes the carrier to apply to the interstate commerce commission for leave

to charge a less rate for a longer haul, it does not prohibit a railroad company from charging a less rate for a longer haul, if it can justify that rate by showing that the circumstances and conditions are dissimilar, whenever it is challenged before the commission or in the courts. Preliminary permission by the commission may be necessary to save the cost and expense of such a challenge, but it has not been declared by congress to be essential to the right to make the rate, if the company can justify it; at least, not under the circumstances of this case, as we shall presently see. Therefore, if, by the mathematical process to which we have adverted, operating upon the scheduled equality of rate, it should turn out that a less rate has been charged to Grand Rapids than has been charged to Ionia, it does not follow that the railroad company must be prohibited from using it merely because it is less, but it should be prohibited only when it appears that the circumstances and conditions are substantially similar. In our view of that section, the assumption that the company has, by the grouping, admitted a violation of it, is, in our judgment, unsound. We do not say but that, on facts like those we have here, the carrier might be found to have violated the act, but only that the fact of grouping is not of itself conclusive against it, of a violation, if it should turn out, by mathematical scrutiny, that a lesser rate has been charged for the longer distance. If that fact appear, as it does on the theory of deducting the cost of the cartage, or by deducting anything whatever from an equal rate, it still remains a question of fact, to be determined on the proof as to the similarity or dissimilarity of circumstances and conditions in the particular case. What we have said in reference to the probative value of the circumstance of grouping, and its equality of rate, in reference to the fourth section, applies as well to the second section of the act, when, by a like mathematical calculation, deducting the cost of the cartage from the equal rate, there appears to have been an indirect "rebate" or "device" by which a greater or less compensation has been received for a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, thereby resulting in an unjust discrimination, as denounced by that section. Likewise, it applies to the consideration of the facts in their relation to the third section, which prohibits undue or unreasonable preferences or advantages to particular persons or localities, in almost the identical words of the English acts under which this subject of cartage has been so often considered in the cases we have cited.

Having determined, therefore, that the mere act of grouping, and its equal rate, is neither, in law or fact, conclusive against the carrier on the question of substantial similarity or dissimilarity of conditions and circumstances, it is open to the courts to inqure at large into those conditions and circumstances, and say whether or not the company is justified in giving to its customers at Grand Rapids a service for the collection and delivery of their goods to and from the rails which it does not give to its customers at Ionia, while charging both the same rate of compensation; and in making this inquiry it must be conceded that it proceeds upon precisely the same

considerations upon which it would proceed if at Grand Rapids the gross charge for both services were separated as they should have been in the published schedules, and that, for the accessorial cartage not having been justified, it should appear by this separation that a less rate for the carriage proper had been charged at Grand Rapids for the longer haul. We have come to the conclusion that, so looking at the facts and circumstances of this case, none of the sections of this act have been violated by the fact that the railroad company collects and delivers at the premises of the consignors and consignees at Grand Rapids, and does not collect and deliver at the premises of the consignors and consignees at Ionia. The two localities are widely separated in distance, and so related to the general trade with which this transportation traffic is concerned that they are not at all competitors with each other in that trade. It is found as a fact in this case that there is "but slight competition" between them, and we take it, for practical purposes, that there is none. This extra accessorial service which is rendered at Grand Rapids could not well be an undue and unreasonable advantage or preference of a rival in trade, when there is no competition in trade, and such rivalry does not in fact exist. Looking at it as a mere contest between "localities," this would seem to be quite important as a condition for the question we have in hand. It may be true that to individuals who pay for the cartage the prime cost of the goods on the premises of a shipper at Ionia would be somewhat larger than the prime cost of the same goods on the premises of a merchant at Grand Rapids who does not pay for his cartage, which would be a disadvantage; but whether an undue and unreasonable one would depend upon the cost of the carriage to the carrier at the two places, respectively, and the general relation of the carrier to all the traffic that is done at either place. These considerations, however, have been had in congress, and resulted, notwithstanding their force in favor of the carrier, in the prohibition, in the fourth section, against charging less for the longer than the shorter haul, thus formulating a statutable declaration that such an advantage is unreasonable. If this stood alone, and unaffected by other "circumstances and conditions," it would be sufficient to condemn the carrier and compel him to lessen the rate at Ionia, though not necessarily to discontinue the extra service at Grand Rapids, or to establish an equivalent service at Ionia. But it will be observed that the fourth section only denounces a greater compensation "in the aggregate" for the transportation for a shorter than a longer distance, which is explained when we turn to the sixth section, concerning the public inspection of the schedules, where we find, as before pointed out, that the carrier is required to keep separately noted on the schedules the "charges" for the whole service, including "terminal charges," whatever that may mean, and the accessorial services which are noted in the first section, these being included in the description of "rates," "fares," and "charges," all plainly interpreted by the preceding sections, including the first, which must not be overlooked, and it is the aggregate of all these rates, fares, and charges on the schedule which must not be greater for the shorter

than for the longer haul; and the fourth section does not say that the compensation for transportation on the rails proper (that is to say, the "rates" or "fares," exclusive of the "charges" for the accessorial service) shall not be less for the longer haul. The section means, properly construed, as we think, that, taking all the rates or fares and charges incidental to the transportation together, these shall not be more for the shorter haul; and since, in this case, they are precisely the same, the section, in its very terms, is not violated. Another clause of the section especially enacts that this equality of the "aggregate" compensation shall not be considered as authorized or sanctioned by the previous language of the section, but is careful not to prohibit it, which means that it may be equal for the longer and the shorter haul only when the circumstances and conditions justify, and in this case it has been sanctioned by the permissive grouping which has taken place. There is no doubt that it must be equal in fact as well as in form; but, when it appears to be equal in form, it will be taken to be so in fact, until it is shown to be colorable and unlawful by him who challenges it. There seems to be a kind of statutory dispensation for an equal rate, as against the outlawed less rate for the longer haul, but, after all, in legal effect, either can be justified only by the same facts; and there is no difference, except that, the one being naturally more tolerable than the other, congress was influenced, out of abundant caution, to insert the peculiar clause to which we refer. Therefore we think that the fourth section does not conclusively appear to have been violated when the railroad company has charged an aggregate compensation for all its services of transportation at Grand Rapids which is just equal to, and not less than, the aggregate compensation for all its services of transportation at Ionia, merely because the items going to make up the aggregate are not the same at each station, or the equivalent of each other. But, when the statutory propriety of this equality is challenged as it has been done here, it is the duty of the railroad company to justify it under this fourth section; and we do not wish to be misunderstood as holding that it is lawful to charge an equal rate in the aggregate, if, upon scrutiny of the items going to make up the whole charge, it shall appear that as to some of them there is such an inequality of advantage and benefit that, not being justified by the circumstances and conditions, it constitutes in fact an evasion of this definite prohibition of the fourth section. What we do say is that this disadvantage to the Ionia shipper to which we have called attention is not unlawful when it arises by reason of an item of the charge contained in the aggregate of compensation, which, although different, is, under the circumstances and conditions, reasonable for the carrier to make in the due course of his business at that place. The items of cost for which the aggregate charge is made at either place need not be the same, and rarely would be, we should think; and this balancing of the items in the bill of particulars to find a difference in the rate is outside of the scope of the statute, unless it be in itself a process necessary to prevent some evasion of the law, established by the facts.

And this brings us to the consideration of the circumstances and

conditions at Grand Rapids which concern this carrier's mode of collecting and delivering the goods for its customers at that place. A minor "condition," which is analogous in its operation to that which we have before mentioned, of a want of competing trade between the two localities, is the difference between them in regard to the extent of population to be served, and the amount of the traffic, in tons, that is done at each place, respectively; the one being a city of 70,000 inhabitants, and the other of only 6,000; the one having a traffic of nearly a million of tons and the other of but 55,000 tons. It is entirely true that it would defeat the purposes of this act to hold that discrimination could be made against a shipper or a locality merely because it is smaller than another; but when we come to consider whether or not, in the "aggregate" compensation received from either, the particulars of the service going to make up an equal charge to each are the equivalent in value of each other, and, for want of that equivalency, to pronounce it an unjust discrimination, it is not improper, we think, if the question shall turn upon the nature and character of that accessorial service we have heretofore described, whether it be one of "terminal facilities," strictly speaking, or not, to look to the population and the traffic at each place to see if the facilities used for collecting and delivering the goods to the customers, relatively and comparatively, are unreasonable, unequal, and discriminating. We cannot say that a railroad company, exercising that freedom in the conduct of its own business which is still left to it, notwithstanding the regulations of the interstate commerce act, may not reasonably, and without undue preference or advantage, and without unlawful discrimination, collect and deliver at its own expense goods at one locality, and not at another, where there is such a dissimilarity of population and traffic tonnage as we have here, so long as its aggregate compensation for the whole service is not greater for the shorter than the longer haul, but is exactly equal. But the leading, most important, and controlling feature of the situation at Grand Rapids, as shown by the proof, is the fact that the railroad company terminates its rails at a point relatively far distant from the business sections of the city. This condition was first established 25 years ago, for reasons that do not clearly appear from the proof, but which may be inferred to be largely those arising out of considerations of economy; and it is altogether probable that traffic relations with the Grand Trunk System, breeding a desire to adopt the English habit of collecting and delivering goods by its own cartage, may have also largely influenced this location, and ever since that time it has continued to so collect and deliver its goods. There can be no denial of the suggestion that has been made, that one of the purposes of the interstate commerce act was to break up unjust discriminations that had become hoary with age; and the long existence of an abuse can in no sense excuse its indulgence, or arrest the operations of this act. Nevertheless, it must first be established as an abuse before the act can extirpate it, and being one of the established customs of this railroad, and a well-known appliance used in its business, the very fact of its long existence is still a circumstance or

condition to be considered in determining whether or not it is a violation of the act to keep it up at this place, and not to establish it at other places where the appliance has not heretofore been used. Taking the interest of the public at Grand Rapids, and looking at it as an established and familiar business convenience, and a habit to which they have long been accustomed, it becomes manifest that the carrier could not abandon it, voluntarily or by coercion, without creating that dissatisfaction and prejudice against itself which would have a natural tendency to drive away its customers and lessen its revenues; and, being of that separable character and outside transaction which we have shown it to be, it may well be doubted if congress had any intention, if it had the power, to deprive a carrier of such an appliance by imposing upon it the necessity of either abandoning it, or the establishment of similar appliances at all other places on its road; for it comes to this: that, if this company must afford cartage facilities to its customers at Ionia, it must do so at all other stations.    If congress had knowledge, as we must presume it had, of the existence of such an instrumentality among the appliances of railroad companies, any intention to discontinue it should be made manifest by more direct language than we have in this act, and not dependent solely on implications to be drawn from it.    While no railroad company should be allowed to use any of its appliances for the purpose of making unjust discriminations or undue preferences, in evasion of an act designed to secure just and fair dealing, the long-continued existence of such a custom as we have here may well be regarded as one of the "circumstances," if not "conditions," mentioned everywhere in the act as elements which are to enter into the decision of the question of unjust and unfair discrimination; and it may well be argued that it is unjust and unfair to the people at Grand Rapids to deprive them, in the name of the qualified equality which the act establishes, of this long-used custom of convenience.    Our law affords abundant instances of its tender regard of the established customs of the people.    We think that the consequences of the deprivation to the people of Grand Rapids of this custom may be held to be one of the circumstances which may relieve a carrier from the statutory obligation of equal facilities elsewhere, to say nothing of injury to itself.    There having been no such long-established custom at Ionia, and their station having been located much nearer to the business portion of the town than at Grand Rapids, exhibits a dissimilarity of circumstances between the two places.

Another condition or circumstance is that having so long ago adopted this plan of accessorial service, and adjusted its terminal facilities at Grand Rapids to that plan, to now abandon it, and, in lieu thereof, project its lines of rails and new station appliances into the traffic centers of the city, would entail upon the carrier an enormous cost for rights of way and other necessaries of construction and reconstruction.    The city having so largely increased in population since the station house was first located and the cartage plan was first established, and the cost of railroad building having so immensely advanced, especially in that which is imposed by the

greed of municipal authorities having control of the streets and public ways of a large city, or of the private owners of city property, upon a company seeking, under constraint, to purchase the rights of way, there is scarcely any probable estimate of the cost, short of an actual survey, too large to imagine as a loss which would be incurred in offering to the people of Grand Rapids facilities equivalent in convenience and attractiveness to that which they would lose if the company were compelled by law to give up the cartage now in use. There is no situation like this at Ionia. While we have no doubt of the ample power of congress to regulate interstate commerce, a doubt may be suggested if, even by more direct legislation than that which we have here, it would have a constitutional sanction for an act which, under the disguise of "regulation," would thus impose upon a railway company such burdens as this, without making compensation in the interest of the public which was to be benefited thereby. The ordinary or inviolable freedom of the use of its property which this company enjoys, and which cannot be taken from it except by due process of law, and upon full compensation, might be affected by such legislation.

Finally we have a circumstance not more important than those to which we have adverted, but more striking in its appearance of importance, and that is the competition of rival carriers at Grand Rapids for the same traffic. It needs nothing more than the mere suggestion of the facts themselves to display the disadvantage there would be to this company if it remained with its station houses in the suburbs of Grand Rapids, without the privilege of collecting and delivering by carts, while its rivals had station houses located immediately in the business center of the city. It does not, then, become a matter of competition and business rivalry, but substantially of the annihilation of the business of this company at that point, or, more intolerably, a denial to this company of the right to compete with its rivals as now it may. Its only possible remedy would be the building of its tracks into the city, at the cost we have suggested. There is no such condition or circumstance as this at Ionia. There is there no rival line of railway to compete with this carrier for the traffic that is to be carried, yet this is not the effective dissimilarity of these conditions and circumstances. That arises more directly out of the fact that the shippers at Ionia are as close to their station house on this carrier's line as the shippers at Grand Rapids are to the lines of this carrier's rivals there; and this carrier is so much further away from the premises of the shippers at Grand Rapids that they cannot reach its station house as readily as the shippers at Ionia can, or as readily as its rivals can reach the same shippers at Grand Rapids. It is the circumstance of greater distance, not measured by the cost of cartage as between the shorter and longer distance, but measured by the enormous cost there would be to this carrier to put its station house as close to its customers at Grand Rapids as its station house at Ionia is to its shippers there, and as close as those of its rivals. In other words, this carrier has so favorably located its station house at Ionia that it is as close to the shippers there as any station house of its rivals at

Grand Rapids is to the shippers at that place; and Ionia merchants, being, in shortness of cartage distance, as close to its station house as the most favorably situated shippers at Grand Rapids to any railway station available to them, should not complain, since they have each quite equal facilities to railway stations from which their goods may go or come in the general traffic eastward. But this carrier being, at Grand Rapids, further away from all shippers there than it is from those at Ionia, cannot reduce this distance to equal advantage for both places without the enormous cost to which we have referred. It is therefore apparent from the proof that it is cheaper for the respondent to collect and deliver its goods at Grand Rapids by carts than to put itself nearer the premises of the shippers at that place, and thereby make cartage as insignificant or cheap, or as nearly so, as at Ionia, or, rather, as little obstructive to the object of getting business as at Ionia. The dissimilarity between the two is that this particular carrier is further away from Grand Rapids than Ionia, not in the sense of simple distance, but in that of the cost of getting nearer. Wherefore the identity of cartage cost per hundredweight, mentioned in the proof, is not the essence of this situation, but the cost of substitution. If it were a mere question of miles, or quarters of a mile, this dissimilarity would not be so important; but, when we take into consideration the cost of other methods of accessorial service to this company at Grand Rapids, the dissimilarity becomes at once formidable, and, standing by itself, would possibly be enough to control the decision in this case.

Now, then, the only effect of the fact of competition, in such a state of things as that we have at Grand Rapids, is that this carrier loses the traffic entirely, not because it cannot make, under the statute, a lesser rate to shippers on its lines than at Ionia, the shorter haul, but because it cannot afford them equal facilities of access. The statute cannot be violated merely to get traffic from a rival by giving lesser rates than to people more favorably situated; cannot bleed Ionia to make up for the misfortunes of competition at Grand Rapids, for congress has prohibited such a practice, but it has not prohibited the carrier from resorting to a cheaper method of securing access at Grand Rapids than one more costly. It has not prohibited this company from entering into competition with its rivals by some mode of access to shippers at Grand Rapids, and why not this mode? It has not been prohibited from extending its lines and placing its station houses alongside of those of its rivals, and why should it be prohibited from sending its carts there? It has not, we think, and these prohibitions of the statute should not be allowed to so operate by mere construction of words. It is quite the same thing as if this carrier should stop many miles away from Grand Rapids, and be unable to enter there unless it could form a connection with some outside agency which would undertake to bring to its lines the traffic at Grand Rapids, and carry from its lines the traffic to the shippers at that place. Could it be said, in such a state of circumstances, that this carrier should not make a contract to pay for such service out of its revenues without being amenable to the restrictions and penalties of this act, if it should

turn out that the rates were unequal between Grand Rapids and Ionia, as it now appears by the mathematical calculations that have been made? We do not overlook the fact that the act applies to continuous lines connecting with each other. That is not the situation we suggest, but it is that of a carrier so separated—from whatever cause—from the shippers at a town that it cannot reach them, except through the employment of a separate and distinct and outside accessorial service, that does not form, in the contemplation of the act, a "continuous line" of transportation to the premises of the shipper. Congress was not contemplating that kind of a continuous line, but one from market to market, city to city, or station to station. Let us take an extreme case, and imagine this railroad company's lines terminating at Ionia; that a transfer company should agree with it to carry, with carts, to the station house at Ionia, goods destined to and from Grand Rapids; and that in order to secure this traffic the carrier should agree to pay for the service of the transfer company, charging no more, but exactly the same, to the people at Grand Rapids that they charged to the shippers at Ionia. Could it be said that the shippers at Ionia could complain of this arrangement as being a discrimination under any of the sections of this act? We think not; and we do not see the difference between the arrangement just suggested, and that which actually appears in this case, except the longer distance to be traversed in the accessorial service. It might be so long as to fairly come within the statutory meaning of a continuous line, and be a single transportation, subject to the long and short haul rule, and all that, but it would be a condition so dissimilar from that pertaining to the shippers at Ionia that it might be held to justify a lesser, to say nothing of an equal rate, and unobjectionable, under the statute; and if the volume of traffic would compensate the carrier, and be an object worth attaining in its own interest and that of the public at Grand Rapids it would be commendable, as well as fair and just. Ionia could have no claim to break it up, worthy of attention, especially if it had no business rivalry with Grand Rapids.

The whole of these dissimilarities of condition and circumstance, as between Grand Rapids and Ionia, whether of competition, or what not, may, in our view, be summed up in the statement that this particular carrier cannot have access to the traffic at Grand Rapids without this cartage service that is complained of by Ionia, while at that station it can have access to the relatively insignificant traffic there given to the carrier without it. But for the rival lines at Grand Rapids, the carrier might force the expense of the inconvenience of the location of the station house on shippers there, just as, in thousands of localities, it is enforced on shippers who must cart their goods sometimes 10 or 20 miles, or even more, in some places, to reach the nearest railway station. But in this instance, because of these nearer tracks, the shippers cannot be forced to incur this expense, and this condition or circumstance compels the carrier to supply the access which it does supply as cheaply to itself as possible; and any interpretation which prohibits it from doing this in the cheapest way is an unjust discrimination in the "regulation of

commerce," against this particular carrier, if not unlawful, and cannot be any less unjust and unlawful than it would be if the prohibition extended to an injunction forbidding the carrier to build its lines and station houses as close to the shippers at Grand Rapids as those of its rivals.   If it did this, confessedly, it might, by grouping, charge an equal rate with Ionia, although that is the shorter haul, and would by such extension be still shorter.   Hence, we do not see why they may not just as lawfully charge an equal rate if the access at Grand Rapids be had by carts, rather than by extended lines of rails.   Surely, if the rails were extended, and an equal rate were charged, Ionia could not demand that a mathematical calculation should be had of the exact cost of the new access, and an aliquot part of the equal rate be deducted, in order to make a showing of the larger charge for the shorter haul.   What Ionia really demands is that she shall be allowed to impose an additional burden upon the carrier, by taking advantage of appearances in this matter which ignore the inconvenient and distressful location of its station house at Grand Rapids, while its own station house is as conveniently located in that respect as any station house could well be.   There is no reason why the defendant company should be thus forced to build its lines into the city to secure its railway traffic.

In reply to the argument that there must be some limitation upon the distance from the shippers to the station house for which this accessorial service would be permissible, or else the same benefit could be claimed for any shorter distance than that which exists in this case, it would seem sufficient to say that if this carrier's lines were projected into the city of Grand Rapids, and its station houses located adjacent to those of its rivals, so that there would be literally no difference of convenience to the shippers, the additional accessorial cartage would then be, on the face of it, an unjustifiable discriminating benefit, which would also be apparent if the new station house were located relatively with the same advantage that the other station houses are located, and, to put it more directly, if the station house at Grand Rapids should then be relatively as convenient to the defendant company's customers as the station house at Ionia, which is possibly the legal test.   No matter what the distance, great or small, if the peculiar conditions be such that the carrier cannot, except at great cost, have access to the traffic without some supplemental agency, the dissimilarity would exist.   For example, suppose that, through some favoritism, a railway carrier should be denied access to the wharfs on a water way from and to which the traffic of that water way was delivered, and that, by the establishment of accessorial cartage to and from the wharf, the railway could share in the traffic with rivals who were favored with a more direct access; the condition would then be analogous to that we have here, although the cartage might be for only a few hundred feet.   Or suppose even that there were no circumstance of rivalry in the condition, but that at one station, situated on a water way, this denial of access should exist, while at another station, remote from the water way, no such access were needed; now, if, to get the traffic conveniently from the water way,

the railway company should establish an accessorial cartage service, and, grouping as it may with the remoter station, would charge an equal rate for the whole service, including collection and delivery at the water side, then surely there would be in such a condition a dissimilarity to that at the remoter station which would justify the equal rate, without incurring the denunciation of the statute. Everything here depends upon a fair, reasonable, and just consideration of the particular facts and circumstances of each and every case; and, in the nature of it, there is an impossibility to prescribe any general rule of law to govern it, because it is not a question of law, but a question of fact.

No case has been cited on either side precisely like this, and it belongs particularly to that peculiar class of cases as to which it has been said by the English courts that the argument from authority seems to be without any conclusive force, because it is so distinctly a question of fact. In the case of Parker v. Railway Co., supra, Coleridge, J., in delivering judgment, treats a case quite analogous to this, if the marked distinction be noted that it was a controversy between the carrier and the complainant about alleged preferences against him and in favor of itself qua carrier and its carrier's agents doing the carting for the railway qua carrier, while the complainant did his own carting, the charge being in that case for precisely similar services from and to the same place. It was not, as here, a controversy between widely-separated localities, but between persons doing business at the same place, and over the same route. In the eighth and last branch of the case which he considered, there was paid by the company to contract carter's or carrier's agents one shilling and sixpence more to cover the cartage service than was collected from the shippers employing the railway company itself as their carrier, and whose goods were thus carted for them by the railway company. The plaintiff, an outside carrier over the line in competition with the railway company qua carrier, did his own carting, and sued to recover back this extra shilling and sixpence per ton, upon precisely the same theory of mathematical deduction from the station to station rate that was adopted in this case. It was held that because the charter of the railway company authorized it to make separate arrangements for the accessorial facilities, very much as the Michigan statute does in this case, and protected the public against inequalities and discriminations in that accessorial service, by a special tribunal, performing, as to them, the same functions belonging to our interstate commerce commission, pro hac, the question of unlawful discrimination in the accessorial service was to be treated separately, and on its own facts or merits, so to speak, and should not be confused with the station to station charges, and with that other equality as to the latter which was protected by another section of the railway charter, and that the plaintiff could only complain if the company should refuse to carry his goods in its carts for the same rate of carriage that it carried his rivals' goods in its carts. He was not to have it deducted from the station to station rate, in order to make him equal by that process. Of course, in the consideration of that equality between "localities"

which is secured by our act, and now by the most recent act in England, there is a wide difference in the application of the rule of the case just cited.   It possibly would be inadmissible to say that this act could not be violated by the railway company, except by a refusal to do an already established carting for the shippers at Ionia on the same terms upon which it does the carting for the people at Grand Rapids; but the application is found in the fact that we have here, as there, in the Michigan act, a special authority authorizing this company to establish the accessorial service, if such legislative authority be needed.   And here the powers of the interstate commerce commission to deal especially and separately with the accessorial service are as ample as were those of the special English tribunal; and according to the ruling in that case the accessorial service here should be separately and independently treated, as it was there, and then, mutatis mutandis, it comes to a plain statement of the question whether or not, under our act, this railroad company is bound to establish a cartage service at each and every other station, when at station A its shippers have had their goods collected and delivered on their premises by the railway company? Shall it be compelled, at every locality or station, to collect and deliver on the premises of the shipper, because it does at one?   And that is the real question in this case.   It may be that it is a proper construction of the act to compel the company to do this, but, if so, it must be done upon the theory that equality of accessorial facilities means an equality, not between shippers using the same facilities, but an equality of facilities at each and every station, and not, we conceive, upon any theory of securing that equality by a mathematical readjustment of the rail rates from station to station.   And, seemingly, the peremptory order of the commission to abolish the cartage at Grand Rapids adopts that view, but if so the mathematical calculation was wholly irrelevant.   In another but earlier case between the same parties, supra, there was a controversy over the accessorial service, which the plaintiff did for himself, he having to pay the full charges made to other shippers for whom the company did the selfsame service between different stations, or pairs of stations; and he sought to recover, as for excessive charges, that which was paid for cartage by others to the company.   It was held that a shipper could not be compelled by the company to accept the accessorial service which it supplied, but should have the privilege of doing it for himself, and that the cost of it should be deducted from the full charges made to other shippers for whom the service was performed.   There it was again a struggle between two rival carriers over the same line, between the same pairs of stations, for charges covering precisely the same services; as if, in this case, a shipper at Grand Rapids should choose to do his own cartage, he might compel the company to deduct its cost from their full rate, in which it was included, if it were so included as a fact.   The main fact found in that case was that the service at the several stations actually performed by the company was the very same service for which it refused to make the shipper doing it for himself any allowance for its cost, no reason whatever being given for the discrimina-

tion.   Obviously this deduction of the cost of the cartage well illustrates when that reduction may be required.    Just as obviously the circumstances here are different,—we mean in their application to the common principle applied in both, by the court there, and by the commission and the court below here.    Unless we assume, as was assumed in this case, the exact equivalency of cost to the carrier of the carriage on the rails, dehors the accessorial service, the deduction cannot be made, under any of these English cases.    Now, it is true that where the whole service, and all its parts, whether main or accessorial, is precisely the same to each of the contending shippers, the schedule charges of the company may be fairly inferred to represent that equivalent cost; but it is otherwise where the service, or any of its parts, is different, as between the two contending shippers, and where the only fact from which the equivalency of service may be implied is that of an equal rate for both on the schedule of charges, which fact is here explained to come, not from identity of parts, or equivalency of service in every part, but only from a permissible grouping of the two, notwithstanding the literal prohibitions of the act of congress.    There appeared in that case not alone the one fact of an equal rate, but others aliunde, from which was established the foundation fact, that of an exactly equal service in all its parts, namely, here the service is not otherwise shown to be equal, but is claimed to be so solely because of the equal rate taken alone.    We have already held in this case that the grouping rate did not imply equivalency of the circumstances and conditions mentioned in the statute, nor is this necessary equivalency of cost to the carrier to be so implied, on the facts of this case, from the circumstance of an equal rate arising only out of the grouping on the schedules.    The admission imposed upon the company in that behalf was called an admission of similarity of condition and circumstance, but, if this did not mean an equivalency of cost of strictly rail carriage, it could afford no foundation for the reduction of cartage, under any case we have examined.    Always the minuend of the arithmetical process of subtraction is the equivalent cost of each carriage to the carrier, and the subtrahend the cost to the carrier of the equivalent accessorial service which has been done by the shipper himself, but charged by the carrier as if done by him.    Here it was found as a fact that the rate of cost at Ionia and Grand Rapids was the same, but it did not thereby sufficiently appear, in our judgment, that cost of carriage to the carrier was the same; and therefore the mathematical process was inapplicable, treated strictly on its own merits. But we place our judgment upon the broader ground that in a case like this it does not apply, because of dissimilarity of circumstances and conditions attending the accessorial service at Grand Rapids and Ionia, respectively.    These two instances we have cited are sufficient to illustrate the authority of adjudicated cases for the deduction of cartage from rail rates between the stations.    In the Baxendale and Garton Cases, supra, the deduction of cartage and other analogous service was gone over in different phases of the question, and the result of previous decisions was stated by Cockburn, C. J., thus:

"That principle is that a railway company has no right to impose a charge for the conveyance of goods to and from the station, where the customer does not require such service to be performed by the company."

And, where it is a dispute about substantially the same service for each shipper, there can be no doubt of the application of that principle, but it requires different treatment, upon broader grounds, when it is brought in to determine a dispute between two localities qua localities, and not as classes of shippers having substantially the same service performed under the same circumstances and conditions; and, as we have endeavored to show, the bearing of the same or equivalent conditions and circumstances is not always the same as to each of these categories.    That pertaining to different stations usually turns not so much upon rates of freight charges as upon a difference in uses of the facilities furnished or withheld at the several stations, of which Ayres v. Railway Co., 71 Wis. 372, 37 N. W. 432, where a discrimination as to the use of live-stock cars was complained of, is a convenient illustration.    Hutch. Carr. § 291 et seq.    And this case, in our judgment, belongs rather to that category, and must be so examined, as to the bearing of the circumstances and conditions, in their similarity or dissimilarity under the interstate commerce act, than to the other category of a differential freight rate, to which it has been confined by the interstate commerce commission—the complainant in the case—and the court below.    Take the condition or circumstance of competition for example.    That circumstance might be more effective to justify a discrimination as between two disputing localities, like Grand Rapids and Ionia, as they present themselves in this record, than as between two shippers, or classes of shippers, themselves engaged in the rivalry of competition in their lines of business, either at the same place, and where the general service for each was the same, as in Evershed's Case, supra, which has been relied on in favor of Ionia, or as shippers at different places, but competing with each other in the same markets, as appears in other cases.    That case went through all the courts, including the house of lords, and is a leading case on the subject, belonging, we repeat, to the class of adjudications about discrimination in rates, and not facilities, wherein the injury to the shipper in the particular case, who was paying more money than his rival for the same service, was the cause of complaint; and, if he directly pays it, he may recover it back, on the common counts in assumpsit.    Hutch. Carr. § 301 et seq.    The traffic acts in England and here have enlarged the remedy, and afford additional redress, or where the action of assumpsit to recover back unlawful charges would not apply; but still the tests, in the absence of specific statutory tests, like the longer and shorter haul, are yet quite the same, at least in their judicatory value.    Apparently there may be a discrimination in rates, when truly there is only a fairly-justified difference in "facilities," which produces this appearance of a difference in rates; but this is only another mode of saying that the conditions and circumstances are dissimilar, which being recognized by the statute as a necessary discrimination, it cannot, therefore, be unlawful.    Let us imagine a narrow-gauge road competing at Grand

Rapids with a broad-gauge road, and making an equal rate with it; but, in order to use its diminished cars, it becomes necessary to repack or transfer the goods from connecting cars to its own. Could it be said to violate this act, if at Grand Rapids it paid for the repacking or the transfer, and, there being no other than the narrow gauge at Ionia, it charged there a full rate?    Should it be compelled at Ionia to lessen the rate by so much as the repacking cost, or the cost of transfer, on the theory that this cost being deducted made a rate less for the longer than the shorter haul, or was a "rebate," in effect, or an "undue advantage"?    There would be a physical condition in the matter of the competition as potential in its dissimilarity as a water competition, or that of a railroad not under the control of the interstate commerce commission, which is recognized as a dissimilarity justifying discriminating rates (Railroad Commission v. Clyde Steamship Co., 5 Inter. St. Commerce Com. R. 327), but none the more potential than we have in this case, where the physical remoteness of the station house cannot be overcome except at great cost.    Moreover, it is just as much out of the power of the interstate commerce commission to correct that physical condition by any order it could lawfully make as in the case of water competition.    It can neither change the gauge of the road, nor lessen the remote distance of the station house, nor yet compel the rival road to charge a larger rate to cover the difference.    It might, forsooth, preliminarily authorize the narrow-gauge road, or that with the far-away station house, to charge a lesser rate than that for Ionia—the shorter haul—which would be ineffective, however, as a remedy, because there is no competition of any kind between Ionia and Grand Rapids, and that station is not involved in this problem of competition of rival carriers at Grand Rapids, in any such sense as this we are considering, or authorize it to charge a lesser rate than the rival carriers, which needs no sanction of the commission, we take it; but that remedy is as useless as the other, since the rival carriers would come down with their rates, and there is the same trouble as before.    What could the commission do?    Its control over rates is not such as to compel the rival roads to maintain a fixed difference, always operating to overcome the misfortune of their unfortunate rival; and it cannot invade the rights of property, and command, by mandatory injunction of the courts, or otherwise, the change of the physical dissimilarity which stands in the way inexorably.

We again say that a doubt may be suggested whether congress has the power, in "regulating interstate commerce," to do a thing like that which was done by the commission in this case, whatever benefits to the public may be desired from equality of treatment, of service and facilities.    We must take the railroad properties as they are, with all the limitations that smallness of means may impose; and whenever the proposed "regulation" departs from the business of "regulating" the facilities and operations of carriers as they actually exist, and enters into the domain of deprivation, construction, and reconstruction of properties, to carry out the proposed "regulation," it is time to pause, and at least consider the effect of

such a process upon the rights of property. We do not find it necessary to base our decision upon such a consideration, in this case; for we repeat that this regulation of the accessorial service facilities which the act has undertaken must be, upon a proper construction of the act itself, confined to the existing state of things in regard to the use of its property by each and every carrier, and the powers conferred upon the commission and the courts must be restricted within the boundaries of "regulation," and not invade the rights of property. As was well said by Creswell, J., in Re Catherham Ry. Co., 1 C. B. (N. S.) 410, 419:

"By the act of parliament in question, very extensive powers are conferred on this court,—powers which may be exercised for the benefit of the public, but which may also be exercised to the great detriment of those who are engaged in carrying on railway concerns; and therefore the courts should be very cautious before they set on foot an inquiry to ascertain that there is reasonable ground for believing that the provisions of the act have been infringed."

And, if we find that the order of the commission to discontinue the cartage at Grand Rapids operates to deprive the carrier of its business at that place, it cannot, in the language of the act, be a "lawful order" or "requirement," which the power of the courts can be invoked to enforce, under the sixteenth section. Separated and distinct as it is, this accessorial service at Grand Rapids, and the use of it, is a right of property of this carrier; and an order of the commission depriving the company of it, and forbidding its use, is not authorized by the act, whatever power the commission may have over it, to prevent inequality of rates as between Grand Rapids and Ionia, where that inequality arises out of the improper use of this bit of its property by the carrier, if a case should present itself where shippers at Ionia and Grand Rapids would be in competition with each other in the markets reached by them jointly, in such a sense that the rates of freight, so discriminated, would give the one the advantage over the other in their rivalries in trade, which is not the case here, as shown by the special findings of that fact. In the Evershed Case, in order to justify the discrimination in rates, there was a struggle to establish the same inexorable necessity arising out of the physical condition that we have intimated here, but it did not avail, for the reason that it did not exist. Here every shipper who lives at Grand Rapids, with the possible exception of any who live adjacent to the ill-located station house, is affected by that distance, in its relation to the distance from the station house of the rival carriers. There it was only two or three shippers who were favorably situated, in having spur track connections with a rival line. The loss here is of the entire traffic of a city. There the defendant company would only lose that of two or three favorably located brewers, which is almost de minimis, in comparison with this. But the great difference is that there it was a discrimination between rival shippers in the same trade, at the same place, sending to the same market, and for whom the same service was done, while here the complainant is a locality—for that is the real nature of it— widely separated from that at which the alleged discriminating out-

side service takes place, and with which the complaining locality has no connection, there not being the least trade rivalry between the two. There, also, there was not only an allowance for cartage, but a direct rebate of the station to station rate, while here the schedule rate is the same, and the only difference is as to the independent cartage service, made necessary by a condition of things which does not exist at Ionia. The judgment of Bramwell, J., in the court of appeals, states the grounds clearly. After recognizing that larger quantities of goods is a justifying circumstance,—which, by the way, we have very strikingly in this case,—he says:

"It is also urged that the three firms had something in the nature of a natural advantage, to the benefit of which they were entitled in their dealings with the defendant. I am of opinion that is not so. They have, indeed, an advantage which enables them to put a pressure on the defendants; but, if the defendants yield to it, they must give an equal advantage to the plaintiff. If the three firms were a mile nearer than the plaintiff to the defendant's station, doubtless the defendants might charge the plaintiff a larger sum for carriage. But the one advantage here that the three firms have is that they have easy access to another railway. So they might have to a canal or an ordinary highway. But these considerations, though a reason for the diminished charge, do not justify the extra charge to the plaintiff."

And Britt, J., adverting to the sidings connecting with the rival line, says this:

"Now, it seems to me that the plaintiff and the three firms of brewers, in their relations with the defendants, were under the same circumstances in every material respect. The defendants did the same thing for both the plaintiff and the three firms of brewers. In each case they collected and carted the beer through the town; they took it to their station; they then put the beer into similar trains, and conveyed it over the same lines of rails; and as may be assumed for the purpose of this discussion, the quantity carried for the plaintiff and the three firms was the same, and between what the defendants did for the plaintiff, and what they did for the three firms, no difference exists, but the charges which they made to the three firms in respect of the same services were different."

In the house of lords it was said by Lord Blackburn that:

"It may be well that peculiar circumstances, as in some of the cases which have been referred to, make some difference. There may be the difference between wholesale and retail. A large quantity of goods may be carried cheaper than a small quantity. That would be a difference of circumstance. And many other cases may be pointed out in which the circumstances would not be the same."

He then rules that what is necessarily done merely to "coax" traffic from a rival carrier is not a differential circumstance, under the English act.

Now, mutatis mutandis, Ionia, as a station, has its station house as near its traffic by rail as any railway station house at Grand Rapids to which the shippers do their own carting, but, unfortunately, the defendant company has its station house, relatively to all the rest,—that at Ionia as well as others,—more than four times the distance; and it offers the carting to overcome this physical disadvantage, not to one shipper only, but to all, coming precisely within the general rule stated by Bramwell, J.:

"It is open to a railway company to make a bargain with a person, provided they are willing to make the same bargain with any other, though

that other may not be in a situation to make it. An obvious illustration may be found in season tickets. A man is taken a daily journey for 1s., for which his neighbor, who takes it once a month, pays 5s. He is entitled to the same benefit, but it is one he cannot avail himself of. So as to goods. If a million tons are carried for A. at a certain price, B. may demand the same rate for the same quantity, though he never will or can, because his dealings are too small."

Here, if this rule applies as to a claim by one station for equal accessorial facilities, the most favorable application of it in behalf of Ionia would be that if the railroad station of the defendant company at that place were a mile and one-quarter distant from the business center or sections of the town, as at Grand Rapids, it should have cartage service at the same price, although it might be that there was no pressure on defendant to furnish it, through rival lines bidding for its traffic; the more unfavorable application of it being that, to entitle it to cartage, it must also have as large a quantity of goods. We have given so much attention to this Evershed Case because it has been misapplied, as we think, in support of the contention of Ionia here; the conditions and circumstances being too wide apart in their application, even as analogies, to the two cases, respectively. But the subsequent cases above cited show that the Evershed Case has been very much restricted, as we restrict it here, if not overruled. So far as it is any authority for the notion that the competition of rival lines is not a circumstance to be considered in determining the question of undue preference, we have the court of appeals, in the Phipps Case, supra, saying that "its authority upon this point is gone"; it having been otherwise ruled in the house of lords, in the Denaby Main Colliery Case, supra. And there is not any doubt that, whatever may have been thought heretofore on the point in England, now the competition of rival lines is one of the circumstances that must be considered, not as controlling, but as an element, along with others, to justify the discrimination of which complaint is made. In the case of Railroad Co. v. Greenwood (1888) 21 Q. B. Div. 215, while stating what should influence the action of the railway commission in its inquiry,—just such an inquiry as we are making here, in determining whether that which our interstate commerce commission did shall receive the approval of the courts as a proper order to be made,— Cave, J., says:

"Obviously, the considerations would be of a somewhat intricate nature. It would be necessary to inquire what were the reasons why more was charged for one distance than was charged for another distance, or why proportionately more was charged for one distance than another; and that would depend upon a great many considerations, arising out of the nature of the traffic, the peculiar facilities, the competition which might be developed, and a great many other matters which, quite obviously, were unfit to be tried before a jury," etc.

And in one of the very latest cases, that of the Liverpool Corn Trade Association, supra, before the English commission itself, in treating of the most recent English act, now extending, in terms, the jurisdiction to controversies between "localities" about unjust discriminations, as our act does, and lamenting that the legislature had not undertaken to prescribe the regulations it has left to the commission and the courts to decide, it is pointed out that not only

the interest of the public (parenthetically, we suggest the public at Grand Rapids as well as that at Ionia), but "the commercial interests and necessities of the railway companies," are to be considered, in fixing charges. Wills, J., in leading up to the conflicting authorities on the more or less potential effect of competition upon the question of undue preference, and reaching the conclusion that it is not to be excluded, but that the "legitimate interests of the railway company" are also to be considered, asks this question:

"What are the circumstances under which it would be natural, after taking other legitimate considerations into account, to ask oneself—First, does the public interest require the maintenance of the lower charge; and, secondly, can the higher charges be reduced without an unfair interference with the interest of the company? Obviously, if, upon other grounds, the court sees there is no undue preference, these questions become immaterial. But if, upon general grounds, and without regard to these considerations, a case of undue preference has been established, the natural consequence would be to order the company to desist from the preference. No order could be made as to how the inequality should be redressed, and the choice between the different ways must always be left to the company. They would be obliged, however, either to level up or level down, or to do both. But suppose they can satisfy the court that to level up would destroy a traffic which, in the public interest, ought to be secured, and that to level down would be to affect an undue reduction (whatever that may mean); it follows that, for different reasons, neither the one method of redressing the inequality, nor the other, nor a combination of the two, ought to be adopted, and that, therefore, the order ought not to be made. In other words. the state of things which creates the preference 'is justified, and the preference ceases to be undue, within the meaning of the legislation."

He was dealing with an English act, which, unlike ours, was prescribing a vague statutory rule,—ours leaving the question open, but it is worthy of remark that he was combating the argument of the attorney general that the English act had prescribed the public interest as the sole or only rule of decision. Parliament, in its omnipotence, might do that, possibly, or within any degree, but we suggest that our congress might find constitutional obstructions to the enactment of any rule which destroyed the carrier's interest, as one of the considerations to be used in judgment. It cannot sacrifice the company's property or rights to the public interest, but can only regulate the business in the interest of both. We are not unmindful of the danger to which the commission calls attention in one of its cases (the Clyde Steamship Case, supra), of overlooking dissimilarities of legislation, methods of trade and transportation, and the like, in dealing with English precedents, and we have tried to avoid it here; but, after all, our act is founded on an experience in the mother country commencing this kind of legislation contemporaneously with the birth of railroad transportation, and extending, in its common and statute law, to all classes of carriers. The general purpose of both is the same, and the rules of administration there and here should be divorced, as they clearly have been by the courts, from any rigid adherence to mere technical precedents and authority, of which the subject is, in its nature, quite incapable, and proceed upon the broader fields of commercial and trade regulation, elastic enough to adapt itself to every recurring difference of condition and circumstance. Our act requires this. That is why the commission

itself exists, and the reason for the anomalous statutory jurisdiction we are exercising. If we proceeded on the usual lines of technical law judgments, the ordinary jurisdiction would suffice. We feel quite sure that, so considered, the action of the commission in this case is not sustained by these English precedents, or any of them.

The question has never been decided in our own courts, so far as we are advised. In the case of Hezel Milling Co. v. St. Louis, A. & T. H. R. Co., 5 Inter. St. Commerce Com. R. 57, the commission follows its judgment in the case we have in hand, under circumstances, as to one of the carriers, more like Evershed's Case, in the condition that the disputing shippers were using the same service, and cartage was allowed to one, and not to the other, on the theory that the case was decided, namely, that the two cities of St. Louis and East St. Louis were one shipping community, in the practice of the companies. But it was said that if that theory be discarded, and they were treated as separate communities, then it would not be a violation of the long and short haul statutory rule, because the rates on both sides of the river would be the same, and then the only consideration open would be the "subordinate matters above mentioned,"—that is, equality of accessorial service. The commission pertinently remarks that it is easy to see that questions of practice under partial or absolute "free cartage" must depend largely, for solution, on the particular circumstances of each case. In their order in the case now under consideration, we think they did not give due weight to the circumstance so peculiar here, of the remotely located station house relatively to the nearer station houses of its rivals, and the cost to the company of overcoming that condition by locating as favorably as its rivals, nor to the circumstance that this is a controversy, not between shippers of the same shipping community, in rivalry with each other, but of remotely separated stations on the same road, having no competition with each other in trade, and not similarly disadvantageously situated as to railway station houses. In the Case of Clyde Steamship Company, supra, and the subsequent case of Gerke Brewing Co. v. Louisville & N. R. Co., 5 Inter. St. Commerce Com. R. 596, the commission reached the conclusion, as we understand it, that the competition of rival lines is to have its influence, if it be outside the control of the commission itself, but if inside that control, it can have no influence, except when the commission shall, upon preliminary inquiry, permit it to operate, and direct the regulations. We do not know that the courts have approved this rule of distinction, nor that we are called upon to decide the question, since we may place our judgment upon this point upon the ground that long before the interstate commerce act, and long before the existence of the commission,—almost a quarter of a century before,—this defendant company was using this accessorial cartage service, and it was not bound, on the passage of the law and of the creation of the commission, to suspend or abandon that service, and await an application for its sanction. It might go on, we think, and justify, if it could do so, when its practice should be called into question. So this case does not fall within the commission's rule, perhaps. It is not impossible that where competition is free and open

to all alike, where every carrier involved is under the control of the commission, where it is only a question of the adjustment of freight rates, and not at all one of overcoming physical disadvantages which operate to shackle one of the competing lines, this rule might be approved by the courts. But where it is one of accessorial services or terminal facilities, or the choice by a company of methods of securing access to the goods to be carried in this physical sense, and not wholly of mere rates to be charged, we doubt if the rule could be applied, even by the legislature, certainly not by the commission: without unreasonable, if not unlawful, restrictions upon the rights of property involved.   Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 682, 4 Sup. Ct. 185; Northern Pac. R. Co. v. Washington Territory, 142 U. S. 492, 12 Sup. Ct. 283; Ex parte Koehler, 23 Fed. 529, and 25 Fed. 73; Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co., 41 Fed. 559.  But in no case is the effect of this competition of rival lines a question to be settled by presumptions, prima facie or conclusive, as to similarity or dissimilarity of condition and circumstance.   Nor is it a question of the power of the commission to mitigate hard conditions, though sometimes it certainly cannot do that, as in this case, by any remedy it can afford, such, for example, as by putting this company on an equality with its competitors in the matter of location of its station house.   It is a question of fact what influence competition shall have in justifying rates, and these rules of evidence, one way or the other, are, at most, only means of ascertaining the fact, but not rules for distributing between them the powers of the commission and the railroad company in the matter of establishing the rates.   The statute prescribes no such distinction between classes of competition that are to justify, or not to justify, discrimination in rates, nor to authorize the railway company to act without the sanction of the commission, as suggested; and, if it may be true that the powers conferred on the commission are broad enough to imply this distinction based on the potency of its control, we cannot say that it should be implied.   If congress had intended so important a rule of statutory construction, the ordinary method of legislation requires that it should not have been left to implication.   Whether the competing lines are within the control of the commission, or not, under some peculiar conditions, the railroad company must act for itself in fixing rates, we should think; and in any case, if, on final adjudication of the fact of the influence competition should have in the given case, the discrimination is justified by the fact, the failure to apply to the commission in the first instance is only a misprision of administration under the act, and cannot be held to impose any penalties of evidential presumptions in trying the fact.   The trial of it proceeds in the courts on the same rules of evidence as to presumptions, burden of proof, and the like, whether the commission has acted preliminarily or not, and only the legislature can alter this right of the company to have the question of the justifying facts tried in that ordinary way in which such disputed facts are established.   This ruling of the commission on the effect of competition, and its operation in practice, overrules its formerly expressed views on the subject of the

initiative in action, as laid down in the case of the petition of the Missouri & I. R. T. & L. Co., Missouri & I. R. T. & L. Co. v. Cape Girardeau & S. W. Ry. Co., 1 Inter. St. Commerce Com. R. 30; and it distinguishes the cases in the courts which may be taken against its new ruling, and we need not cite them. Nor, indeed, do we think we are required to decide that point in this case, for the reason already stated, and need go no further than to say that the circumstance that the defendant company did not apply to the commission to permit the cartage it had so long used cannot be held anywhere to be a presumption against it of similarity of conditions and circumstances. We try the case in the courts de novo, on the facts there presented, but on the prima facie truth of the findings of facts by the commission, which is not, however, the presumption to which we have just adverted. Neither before the courts nor the commission is there any presumption against the carrier that the conditions or circumstances are similar or dissimilar. Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 56 Fed. 925; Interstate Commerce Commission v. Atchison, T. &. S. F. R. Co., 50 Fed. 295. Osborne v. Railroad Co., 48 Fed. 49, was overruled in the circuit court of appeals, but without any expression of opinion on this particular subject, or reference to that which is said in the court below about it. Railroad Co. v. Osborne, 3 C. C. A. 347, 52 Fed. 912.

These cases, and others to which they will lead, leave the question of the influence of competition, as a circumstance or condition to justify discriminating rates, undecided. In the case of Interstate Commerce Commission v. Texas & P. Ry. Co., 52 Fed. 187, strong views were expressed against its influence, based largely on some of the English cases to which we have called attention, and some of which, upon the authority of later cases, may be of doubtful force, as we have shown; but on appeal the question was reserved, and the court said of foreign competition, held by the commission not to be of itself a circumstance or condition of dissimilarity,—what applies quite as well to that which arises at home,—that "its ultimate decision may have a wider influence upon the interstate commerce of this country than we can foresee." Interstate Commerce Commission v. Texas & P. Ry. Co., 6 C. C. A. 653, 57 Fed. 948. We do not feel called on to decide the broad question in this case, and, as was done in that case, limit what we do decide to the narrower field presented by these facts. The bare, naked fact of competition in an open field may not be available to justify discriminating rates on the ground of dissimilar conditions; but it is not to be excluded as a forceful element of consideration, when it results, as here, in the annihilation of the business of a carrier at a particular station on its line, because of a physical or mechanical disadvantage which it may overcome by the use of an appliance which it has long used for that purpose, and the use of which is complained of, and called in question, as an unlawful discrimination under the act. The peculiar condition here is the physical disadvantage existing, whether there be competition or not, but which becomes destructive and fatal when competitors do appear to take advantage of it. The competition is not, then, a bare and naked struggle for traffic on equal terms,

where carriers seek advantage of each other by discriminating rates, or where they use the competition to compel the public to make up the losses to themselves by increased rates elsewhere, and outside of its influence, but becomes, in combination with the physical imperfection, a totally destructive agency. In such a case, however,— it may be in others,—the fact of competition is a dissimilar condition or circumstance, whether within control of the commission or not. The case of Ilwaco Ry. & Nav. Co. v. Oregon S. L. & U. N. Ry. Co., 6 C. C. A. 495, 57 Fed. 673, where the defendant company was allowed the exclusive use of its wharf, somewhat illustrates the distinction we enforce. It was said by the court that "for a carrier to prefer itself in its own proper business is not the discrimination which is condemned." See, also, on this point of self-preference legitimately exercised, Little Rock & M. R. Co. v. East Tennessee, V. & G. R. Co., 47 Fed. 771, 776. So we say that, for a carrier to protect itself against the physical disadvantage it is under in relation to its rivals, is not an unlawful discrimination, if it be not used as a colorable device to evade the act. And we find in the case of Cowan v. Bond, 39 Fed. 54; an illustration that an expense of accessorial service paid by the carrier for its own advantage does not necessarily amount to a discrimination, when, by deducting it from the rate, a difference in rate mathematically appears. There a carrier compressed the cotton bales of a certain shipper at its own expense, and another shipper complained that the expense should be deducted from the usual rate he paid for cotton not compressed; and it was held that, as he could have had his cotton bales compressed on the same terms, there was no discrimination. Plainly, it was no concern of the plaintiff in that case whether the carrier compressed his cotton or not, so it was carried according to the contract, as it is, on the particular facts of this case, no concern of Ionia whether Grand Rapids has cartage or not, so long as it only pays an equal rate for a shorter haul, which is not of itself forbidden.

From what has been already ruled, it is apparent that even if the commission had established, by its inquiry, an abuse to be remedied, the order it gave was not a proper one, and should not be enforced. Large as its powers may be, and plenary as may be the authority of the court to enforce, by mandatory injunctions or otherwise, obedience to its orders, its powers are those of regulation, and not construction or reconstruction. Interstate Commerce Commission v. Baltimore & O. R. Co., 43 Fed. 37, 50, and 145 U. S. 263, 12 Sup. Ct. 844. And now see Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission (Oct., 1895) 16 Sup. Ct. 700. This is, as the commission has made it, a dispute about discriminating rates, and the easy remedy, on such a complaint, is a readjustment of the rates to cover the discrepancy. As was said in one of the cases we have cited, the method of redress by readjusting the rates must always be left to the choice of the company, at least in the first instance; and in the subsequent St. Louis case, supra, the commission adopted that course, and made the proper order. Here was an arbitrary and peremptory order to abandon the accessorial cartage at Grand Rapids, without regard to any rates, or without option as to

readjustment of them, the defendant company not even being allowed the alternative of establishing a like service at Ionia. It is, in its nature, not a regulation of commerce, so much as an interference with the rights of property and its use, which possibly even congress could not, in this way, prohibit. At all events, it is an attempted exercise of a legislative power which congress has not, we think, conferred upon the commission. Northern Pac. R. Co. v. Washington Territory, supra.

Nor was there any power in the circuit court to modify or change the order of the commission. Whatever may be the plenary power of a court of equity to command, at the suit of those who are injured, the performance of any duty arising out of a contract or statutory obligation, the jurisdiction it was exercising here is strictly special and statutory, and is limited, as all special jurisdiction is, to the precise power conferred by the interstate commerce act, which is only to compel obedience to the "lawful order" of the commission. It has not been granted any broader power to exercise the authority of the commission itself by substituting a new regulation or order of its own, or modifying that which the commission has given. It is purely an auxiliary jurisdiction. Interstate Commerce Commission v. Delaware, L. & W. R. Co., 64 Fed. 723. The ordinary jurisdiction of the courts is open to any one injured to invoke their more plenary powers, except so far as that of an action at law for damages has been made optional with the cumulative statutory remedy by section 9 of the act. The remedy by bill in equity has not been so restricted, and is yet available; but here, the powers of the commission being administrative, and not judicial, the ancillary and supplemental judicial jurisdiction is necessarily limited to the purpose of its creation, and can go no further than to grant or refuse compulsory obedience to the lawful orders of the commission, and as it makes them. Interstate Commerce Commission v. Delaware, L. & W. R. Co., supra; Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 567; Interstate Commerce Commission v. Lehigh Val. R. Co., 49 Fed. 177; Shinkle, Wilson & Kreis Co. v. Louisville & N. R. Co., 62 Fed. 690; Little Rock & M. R. Co. v. East Tennessee, V. & G. R. Co., 47 Fed. 772. It confirms our confidence in the rulings we have made that since this opinion was prepared the supreme court has announced its decision in one of the cases herein cited, appealed to that court, in an opinion by Mr. Justice Shiras, which, although presenting differing facts, is in entire harmony with the views we have here expressed. Texas & P. R. Co. v. Interstate Commerce Commission, 16 Sup. Ct. 666. In any view, therefore, either because this order was not according to the right of the case, as we understand it, or because it directed an improper mode of redressing the abuse, if any existed, the decree must be reversed, and the cause remanded to the circuit court, with directions to dismiss the petition, with costs.