## UNITED STATES v. CHICAGO & N. W. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1904.)

### No. 989.

1. CARRIERS—TRANSPORTATION OF SOLDIERS—RIGHT OF UNITED STATES TO PARTY RATES—INTERSTATE COMMERCE ACT.

The government of the United States, in buying transportation on a railroad for its soldiers, in lots of 10 or more, is not entitled to the benefit of a reduced 10-party rate given by the railroad company's schedule to "theatrical, operatic, or concert companies, hunting and fishing parties, glee clubs, brass or string bands, boat, baseball, polo, or tennis clubs, football teams, and other parties of like character." Nor does the refusal to give it the same rates constitute an unjust discrimination against it, or subject it to undue prejudice or disadvantage, in violation of the interstate commerce act, where it is shown that the purpose and effect of the party rate given by the schedule is to increase the company's business, and that tickets sold thereunder are closely limited in time, and are paid for in cash in advance, while those furnished to the government are not so limited, are furnished on a requisition, and are only paid for after indefinite delay in the auditing and allowance of the claims by the War and Treasury Departments. In such case the conditions and circumstances under which the service is rendered are essentially different, and justify the making of different rates.

In Error to the District Court of the United States for the Northern Division of the Northern District of Illinois.

S. H. Bethea and Burton F. Peek, for plaintiff in error.

A. W. Pulver, for defendant in error.

Before GROSSCUP and BAKER, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This is an amicable contest between the railroad company and the government to determine whether the government is entitled to a deduction from the common rates for passenger traffic in the transportation of its soldiers in lots of 10 or more according to the railroad company's "Ten-Party Rate Schedule." The government's claim is that, in view of this schedule, by which the company undertakes to carry, for cash on delivery, theatrical, operatic, or concert companies, glee clubs, brass or string bands, boat, baseball, polo, or football teams, and other parties of the like character regularly organized for the purpose of giving exhibitions and traveling together, for parties of 10 to 19, one solid ticket, 2½ cents per mile per capita, for parties of 20 or more, one ticket, 2 cents per mile per capita, it is entitled, in the transportation of soldiers in parties of 10 or more, to the benefit of the 10-party rate. The company disputes this claim, and demands the usual rate of 3 cents per mile, which, it is conceded, is a reasonable rate for the service.

The facts, as they appear from the allegations of the petition admitted by the answer, by an agreed statement of facts contained in the record, and by the finding of the court below, are as follows:

On or about January 25, 1899, the petitioner furnished transportation for 17 soldiers of the United States from the city of Milwaukee, in Wisconsin, to Ft. Sheridan, Ill.; issuing for such transportation

127 F.—50

one solid ticket, good for the transportation of the entire party. On or about September 14, 1899, the petitioner furnished transportation for 12 soldiers of the United States from the city of Kenosha, in Wisconsin, to the city of Chicago, Ill., issuing for such transportation one solid ticket, good for the transportation of the entire party. On or about September 19, 1899, the petitioner furnished transportation for 13 soldiers of the United States from the city of Kenosha, in Wisconsin, to Chicago, Ill., issuing for such transportation one solid ticket, good for the transportation of the entire party. On or about September 28, 1899, the petitioner furnished transportation for 12 soldiers of the United States from the city of Kenosha, in Wisconsin, to Chicago, Ill., issuing for such transportation one solid ticket, good for the transportation of the entire party.

At the time this service was rendered and transportation furnished, there was in force over the lines of the petitioner a certain so-called 10-party rate, which is set out in hæc verba in the seventh paragraph of the petition. The material portion thereof is as follows:

"Commencing August 1, 1896, the following reduced one-way party rate for theatrical, operatic, or concert companies, hunting and fishing parties, glee clubs, brass or string bands, boat, baseball, polo, golf, or tennis clubs, football teams, and other parties of like character, regularly organized for giving exhibitions or taking part in contests, and traveling together, will be made from any C. & N. W. Ry. Station via the Northwestern Line (C. & N. W. Ry., C. St. P. M. & O. Ry., and S. C. & P. R. R.) to any other station east of the Missouri river, but these rates shall not cover or apply to parties organized only for the purpose of securing the party rate. For parties of ten to nineteen, one solid ticket (2½) cents per mile, per capita."

On or about April 26, 1901, the petitioner furnished transportation for 10 soldiers of the United States from the city of Milwaukee, Wis., to Chicago, Ill.; issuing for such transportation 10 first-class tickets, each good for the transportation of one person between said points.

Prior to the furnishing of this transportation, the party-rate schedule hereinabove mentioned had been modified somewhat, so that, as it then stood, the material portion thereof was as follows:

"Chicago, December 20th, 1900. From January 1st, 1901, until further advised one-way party tickets may be sold for cash on delivery for theatrical, operatic or concert companies, glee clubs, brass or string bands, boat, baseball, polo or football teams, and other parties of like character regularly organized for the purpose of giving exhibitions and traveling together, from any C. & N. W. Ry. Station via the Northwestern Line (C. & N. W. Ry., C. St. P. & O. Ry., and S. C. & P. R. R.) to any station east of the Missouri river. The following basis of rates. For parties of ten to nineteen one solid ticket, two and one-half (2½) cents per mile per capita."

The modified schedule is set out in the fifteenth paragraph of the petition.

During the period at which all of the above-mentioned transportation was furnished, the regular individual one-way rate was three cents per mile, which is admitted to be a reasonable charge for such service.

The following additional facts are made to appear by the admissions in the answer and the agreed statement of facts:

The method of furnishing transportation to the United States of America for its troops differs from that followed in furnishing trans-

portation to the general public, in that all sales of tickets of every kind and description to the general public are, and always have been, for cash, whereas the transportation of the soldiers has been, and is, furnished upon written requisitions made by officers of the quartermaster's department of the War Department of the United States of America upon the local agents of the petitioner, which requisitions, when honored by the issuance of tickets for the number of soldiers called for thereby, form the basis of claims against the United States of America, which claims are, and have been, required to be presented and filed with and be audited by the War and Treasury Departments of the United States, and have not been and are not customarily paid by the United States until after the lapse of long periods of time subsequent to the furnishing of such tickets, and the performance of the service of transportation called for thereby. That this method of furnishing transportation by the petitioner has prevailed for some 30 years last past. The petitioner has never during that period claimed any greater compensation for the transportation of soldiers of the United States than it has for the transportation of those who paid cash in advance, except in so far as it has done so by giving the 10-party rates to those classes of persons mentioned in the schedules hereinabove described; nor has the petitioner at any time charged any more for the transportation of a single soldier of the United States, or any number less than 10, than it does for a like number of the general public, although in the case of the soldier the service was paid for after being rendered in the manner hereinabove described, and in the case of the general public it is paid for in advance. About the year 1899 the government for the first time made the claim that, in the transportation of parties of 10 or more soldiers, it was entitled to the 10-party rates provided for in the schedules hereinabove described. The tickets issued at the party rates in accordance with the schedules are expressly limited very closely in time by the petitioner, but the petitioner does not in the same manner limit the tickets issued for the transportation of soldiers; the difference being that the tickets issued at 10-party rates are limited to the schedule of time to be followed in their travel by the parties to whom such tickets are issued, while those issued to the soldiers are not limited to correspond with any fixed schedule of travel. The object of giving entertainments, exhibitions, or contests given by any of the organizations or parties entitled to the 10-party rate is the entertainment, amusement, and instruction of the public, as well as the pecuniary profit of those giving them; and it frequently occurs that, when the parties or organizations mentioned in the said schedules travel one way over the line of the petitioner, they return again by the same line, thus giving it double patronage, and this fact is contemplated by the petitioner in making the party rate, and the additional patronage thus derived enters into the said rate as a consideration therefor. The giving of such entertainments and exhibitions cause the general public to travel over the railroad of petitioner to and from such entertainments and exhibitions, and thereby increase the business of the petitioner, and this fact is also a material consideration for the granting of such rates to the organizations giving such entertainments and exhibitions, while the transportation of parties of

soldiers for the government does not tend to induce the general public to travel over the lines of the petitioner. In the great majority of instances the financial returns from the business of theatrical companies, operatic and concert companies, glee clubs, baseball, polo, and football teams, and other parties of like character, regularly organized for the purpose of giving exhibitions, are not remunerative enough to enable them to pay regular individual ticket rates and make any profits on conducting their business, or permit the keeping up of their organizations, and, if reduced rates were not given, the great number of such organizations would either have to abandon or greatly restrict the giving of their entertainments, and the public would lose the advantage connected with and growing out of the same, and the petitioner lose the greater part of the revenue which it derives from such business, and also that which it derives from the business of transporting the general public who are induced to travel on the railroad for the purpose of attending such exhibitions, while, on the other hand, in the case of the transportation of soldiers, the charging of regular individual rates does not tend to prevent the movement by the government of such troops. The government of the United States, in the transportation of its soldiers, does not financially, or in any other manner, come in competition of any kind with any of the parties who are given the party rates provided for in the schedules hereinabove described. The government contends that, under a proper construction of the party schedule rate set forth in the seventh paragraph of the petition, it is entitled, in the transportation of soldiers in parties of 10 or more, to the benefit of the 10-party rate, and also that, if it is not so entitled by the construction of the terms of said schedule, then it is unjustly discriminated against, within the meaning of the second section of the act to regulate commerce, known as the "Interstate Commerce Act," and subjected to an undue prejudice or disadvantage, within the meaning of the third section. It also contends that the granting of the party rate under the schedule set forth in the fifteenth paragraph, described therein, and the denial of such rates to the government likewise amounts to unjust discrimination against it, within the meaning of the second section of said act, and subjects it to an undue prejudice or disadvantage, within the meaning of the third section. It has tendered payment for all of the services performed by the petitioner on the basis of the 10-party rate, which tender has been refused by the petitioner on the ground that it was entitled to payment on the basis of the individual rate.

The conclusions of law formed by the court upon these facts were:

"(1) That a proper construction of the party-rate schedule set forth in the seventh paragraph of the petition does not entitle the government to the benefit of the ten-party rate described in said schedule; (2) that the denial of the party rate made by said schedule does not amount to a violation of either section 2 or 3 of the interstate commerce act [U. S. Comp. St. 1901, p. 3155]; and (3) that the denial of the party rate under schedule set forth in the fifteenth paragraph of the petition does not amount to a violation of either of said sections of said act. Judgment will therefore be entered for $113.45."

From the facts stipulated by the parties and found by the court, it is difficult to see how the conclusions of law could have been other-

wise. It seems clear that the agreed facts bring the case within the adjudications already made by the federal courts upon this subject, and that these adjudications are against the claim here made by the government's attorney. It is agreed that the government, in the transportation of soldiers, does not in any way come in competition of any kind with any of the parties who are given the party rates. If so, how can it contend that it is entitled to the party rates provided for in the different schedules, or that there is any unjust discrimination against the United States? It is clear that the government does not fall within any of the designations of persons or parties named in the schedules. There is no analogy or likeness between the business of the government in the transportation of its soldiers and the various classes of persons described in the company's schedules. Under no possible construction of the language can it be claimed that the United States comes within the party rule. The government's business is not like that of a theatrical, operatic, or concert company, or a hunting or fishing party, and it bears just as little likeness to any of the other parties named, as glee clubs, brass bands, boat, baseball, polo, or football teams; nor is it, in the language of the schedules, a party of like character to any of these, regularly organized for the purpose of giving exhibitions and traveling together. The claim that, if the first contention is not good, then that it is unjustly discriminated against, within the meaning of the second section of the act to regulate commerce, and subjected to an undue prejudice or disadvantage, under the third section, is equally untenable. In short, the stipulation of facts is both argument and authority against the government's contention. It is not engaged in the same business as any of those classes that are given special rates, is not in competition with them, and is not, therefore, injured or discriminated against. As was said by the Supreme Court in Interstate Commerce Commission v. B. & O. Railroad, 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699:

"It does not operate to the prejudice of the single passenger, who cannot be said to be injured by the fact that another is able, in a particular instance, to travel at a less rate than he. If it operates injuriously to any one, it is to the railroad, which has not adopted corresponding rates; but, as before observed, it was not the design of the act to stifle competition, nor is there any legal injustice in one person procuring a particular service cheaper than another. * * * If these tickets were withdrawn, the defendant road would lose a large amount of travel, and the single-trip passenger would gain absolutely nothing."

The interstate commerce act is not aimed at putting down just discrimination in the transportation of persons or property. This has always been held legal in this country and in England, and is, indeed, in great measure, the life and soul of the business, both to the railroad companies and the public. By its means new industries are built up, and old ones sustained, to the advantage alike of the public and the transportation companies. Nobody is injured by it, but, on the contrary, everybody is benefited, because the public in this way is best served. It is only unfair and unjust discrimination that the statute, as well as the common law, is aimed at. If two persons or corporations are engaged in the same business, and their situation is substantially alike, any discrimination in rates would be prohibited as in-

vidious and unjust. . It has always been held lawful at common law, and is so under the statute, to allow ministers of the gospel to travel on half-fare tickets. They do not come in competition with business men, and no injustice is done to anybody. But if a transportation company should charge the ministers of one denomination full fare, and those of another half fare, this would be illegal, as involving an unjust discrimination, both at common law and under the statute. Nor does the provision in the schedule that the rates prescribed shall not cover or apply to parties organized for the purpose of securing the party rate alter the construction properly to be placed upon the schedule. Int. Com. Com. v. B. & O. R. Co. (C. C.) 43 Fed. 37; Id., 145 U. S. 278, 12 Sup. Ct. 844, 36 L. Ed. 699. The entire language of the schedule must be looked to, to give the proper construction. The traffic provided for in the company's schedules has no analogy or resemblance to that carried on by the government. It is not a like service, nor "under substantially similar circumstances and conditions." The finding of facts by the court below, following the stipulation of the parties, shows conclusively that the circumstances and conditions, instead of being substantially alike, are wholly different, and this finding is conclusive. Detroit, G. H. & M. Ry. Co. v. Int. Com. Com., 74 Fed. 803, 21 C. C. A. 103. Indeed, the finding of facts throughout this case indicates quite clearly what the conclusions of law should be. The difference in circumstances and condition is almost too obvious to have need of pointing it out:

First. The tickets issued under the company's schedule for party rates are limited closely in time, while those issued for the transportation of soldiers are not so limited. This difference is a material one, as, when the time is limited, the carrying company knows when to provide for the service, as it cannot know in the case of tickets unlimited in respect to time.

Second. By giving these party rates, the public interest in amusements of that character is subserved, as well as the interest of the railway companies, and it would frequently happen that these amusement companies could not travel if they were charged regular rates. One purpose of transportation companies is to create and build up business for themselves, and herein their interest coincides with that of the public, so that they are fostered and encouraged in a way that injures no one, while the railway companies are benefited.

Third. It will often happen that, when such parties travel one way over a line of road, their occasion will lead them to travel back the same way, so that the patronage of the road is doubled, and generally what is a benefit to the railroad companies by way of increase of business is a benefit, also, to the public upon which they rely for support.

Fourth. The giving of the party rates stimulates other travel, and that is one purpose, no doubt, of giving them, whereas the transportation of soldiers can have no such effect. The singing of Patti or a performance of a Thomas concert might bring 1,000 other people to Chicago, while a football match might bring 10,000 people over the company's road, whereas the transportation of 10 or 20 soldiers would be unnoticeable by the public, and would advantage the road in no way, beyond the receipt of the fare.

Fifth. Another material difference is that those who travel by these party rates pay cash in advance, while the government does not. On the contrary, the service must be first rendered, and claims for the same filed at Washington, and undergo examination, and be audited by the War and Treasury Departments, and payment indefinitely delayed. This must always constitute a material difference, so long as commodities can be sold cheaper for cash than on credit. It is quite probable that, if the government would pay cash for the service performed, the railroad companies might afford to make a corresponding deduction in rates.

Sixth. The government, in the transportation of soldiers, does not financially or in any other way come into competition with any of those parties who are given the party rates. Consequently there can be no unjust discrimination in the case, and no cause for complaint by the government; and, if the rates given those parties should be conceded to be illegal, that would be no reason why the government should also be allowed illegal rates. But according to all the adjudications, these party rates are justifiable, and do not constitute unjust discrimination. Elliot on Railroads, 2666, and cases above cited. In the opinion of the court the case of Int. Com. Com. v. B. & O. R. Co., above cited, is directly against the contention of the government's attorney in this case. In that case Judge Sage, in the Circuit Court, uses this language:

"Again, the testimony establishes that party-rate tickets secure patronage that yields large revenues to the respondent, and that the withdrawal of those tickets would almost entirely destroy that patronage, for it appears that the rate is as high as can be made without putting it beyond the reach of those who are the main purchasers. Are all these considerations to be left out of the account in determining whether there has been 'like and contemporaneous service' 'under substantially similar circumstances and conditions?' Does it depend solely upon whether party-rate passengers and those holding single tickets occupy the same cars, have the same accommodations, and are traveling from the same point to the same destination? Is that the full meaning of 'similar circumstances and conditions?' The answer, which the question itself seems to suggest, is that the phrase has a much larger and more comprehensive meaning, else Congress could not consistently have recognized mileage or excursion or commutation tickets, for all these trespass upon the narrow ground on which the contrary view rests. To give the act its proper interpretation, the phrase must be held to include circumstances and conditions affecting the business interests of the carrier and of its patrons, or, in other words, circumstances and conditions of a commercial character, which, while they should not exclude or override the consideration of what is just and reasonably advantageous to those not so situated as to be able to avail themselves of reductions offered to the general public, should be so recognized as not to be prejudicial or unjust to any, and yet, upon the whole, to promote the interest of all concerned in the beneficial operation of the act. Aside from the consideration that these tickets are, in principle, in no wise different from mileage, excursion, and commutation tickets, which is decisive, the fact that they are on sale to all, without discrimination, and without advancing rates for single tickets, and the considerations above mentioned in favor of those who are upon the road continually, and whose business is upheld by bringing the cost of necessary travel within their reach, and those in favor of the carrier, including many not mentioned above, are ample for the vindication of the respondent against the charge that it is guilty of unjust discrimination and undue or unreasonable preference, and therefore of violation of the provisions of the second and third sections of the act."

And Judge Jackson uses the following language:

"When thus considered, it is perfectly manifest that Congress did not intend to impose upon common carriers subject to the provisions of the act any rule or duty of absolute equality of rates in their charges for transportation services. Subject to the requirement of section 1, that all charges made for any service rendered in the transportation of passengers or property shall be reasonable and just, the language of section 2 clearly recognizes and implies that there may be discriminations which are not unjust and not prohibited."

And in affirming this decision the Supreme Court says:

"But whether these party-rate tickets are commutation tickets proper, as known to railway officials, or not, they are obviously within the commuting principle. As stated in the opinion of Judge Sage in the court below: 'The difference between commutation and party-rate tickets is that commutation tickets are issued to induce people to travel more frequently, and party-rate tickets are issued to induce more people to travel. There is, however, no difference in principle between them, the object in both cases being to increase travel without unjust discrimination, and to secure patronage that would not otherwise be secured.'"

And that court, after examination of the decisions, sums up the matter as follows:

"In short, the substance of all these decisions is that railway companies are only bound to give the same terms to all persons alike under the same conditions and circumstances, and that any fact which produces an inequality of condition and a change of circumstances justifies an inequality of charge."

And again, in C., N. O. & T. P. Ry. v. Int. Com. Com., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, the court affirms the same doctrine in the following language:

"Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law—free to make special contracts, looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits."

In Elliott on Railroads, p. 2666, the same doctrine is laid down as follows:

"Neither at common law, nor under the federal statute, does the mere fact that there is a difference in rates necessarily constitute an unjust discrimination, since there is no such discrimination in cases where the conditions and circumstances are essentially different. It is the English rule that, in passing upon the question of undue or unreasonable preferences, various facts and circumstances must be considered, and that an undue preference, within the meaning of the statute, is not shown by mere evidence of a difference in charges. The federal courts have substantially adopted the rule declared by the English courts."

These authorities seem quite conclusive of the law applicable to the case at bar.

Judgment affirmed.